653 So.2d 604 (1995)
BIG "D" DIRT SERVICES, INC., Plaintiff-Appellant,
v.
WESTWOOD, INC. and Capital College Funding Bonding Co., Defendants-Appellees.
No. 94-1234.
Court of Appeal of Louisiana, Third Circuit.
March 1, 1995.
Rehearing Denied May 15, 1995.
Kathy Fontenot Deshotel, Ville Platte, for Big "D" Dirt Services, Inc.
John Isidore Feduccia, Hammond, for Westwood, Inc. and Capital College Fund.
David Carlyle Voss, Baton Rouge, for State of La., DOTD.
Before PETERS, AMY and SULLIVAN, JJ.
SULLIVAN, Judge.
This contractual dispute involves $5,539.93 allegedly owed to plaintiff-appellant, Big "D" *605 Dirt Services, Incorporated, by defendants-appellees, Westwood, Incorporated and American Bonding Company. Big "D" initially sued Westwood and Capital College Funding Bonding Company, then later amended its petition to name the State of Louisiana, Department of Transportation and Development (DOTD) and American Bonding Company as defendants. During trial, DOTD was dismissed as a party defendant pursuant to its motion for involuntary dismissal. DOTD is not a party to this appeal.
Westwood, the general contractor on State Project XXX-XX-XX involving the construction of the Coulee de Manuel bridge, subcontracted with Big "D" for the application of asphaltic concrete to the roadway bridge approaches. The contract price was $13,455.00. Because the DOTD rejected Big "D"'s work, Westwood hired a third party, James Construction, to correct the defects in Big "D"'s work. The corrective work cost $5,539.93. Westwood then refused to pay Big "D" for its work on the project.
Big "D" then sued defendants, seeking the payment of the subcontract amount, $13,455.00. Westwood deposited the amount not in dispute, $7,915.07, into the registry of the court. By court order, Big "D" removed this money from the court registry and, thereafter, the case proceeded to trial. After trial, the district court dismissed Big "D"'s claim against Westwood and American Bonding. The trial judge concluded that Westwood was justified in obtaining the services of James Construction to do the remedial work because of Big "D"'s delay in informing Westwood that it had contracted with H & S Construction to do the work. In addition, he found that the amount paid to James Construction, $5,539.93, was reasonable. On appeal, plaintiff asserts the following specifications of error:
1) the trial court erred in failing to apply the written provisions of the contract, specifically paragraph 22 regarding termination of the contract; and
2) the trial court erred in failing to award damages and attorneys fees for defendants' failure to pay the undisputed amount until after suit was filed.
For the following reasons, we affirm the denial of Big "D"'s claim for the balance owed on the subcontract, $5,539.93. However, we remand this case to the trial court for a hearing on the issue of whether defendants are liable to plaintiff pursuant to La.R.S. 9:2784(C) for penalties and attorney fees for defendants' failure to promptly pay the undisputed amount, $7,915.07.

FACTS
The events pertinent to this case occurred in 1992. The subcontract at issue was executed on April 14 by Dallas Leger, the owner of Big "D", and Janice Amar, the owner of Westwood. Pursuant to the agreement, Big "D" was to overlay the bridge approaches with approximately 207 tons of asphaltic concrete. Big "D" performed the work on May 4 and 5. The paving covered between 150 and 200 feet of roadway on each side of the bridge. On May 14, Amar called Leger to inform him that the DOTD engineer, Woodson Harvey, recommended rejection of Big "D"'s overlay work. She also told him of a May 20 DOTD inspection meeting at the site.
Leger went to the meeting where DOTD project engineer Irvin Deranger informed him that his work was unacceptable and needed correction. Also present at this meeting were DOTD engineer Harvey, DOTD inspector Larry Fontenot, and Westwood representatives Amar and Eric Arender.
The details of what actions followed this meeting are subject to dispute. Leger testified that DOTD ordered him to "mill" or grind off one to one and one-half inches in depth of the road surface at a distance of 40 feet on each side of the bridge. After the meeting, Leger had lunch with Amar and Arender to discuss how to correct the defects in his work. Leger did not own a milling machine and would have to rent one from another construction company. He told Amar and Arender that he would attempt to locate one. Leger stated that, after the lunch meeting, he contacted H & S Construction on the same day. H & S Construction informed him that it could do the milling on July 13. He agreed. However, Leger did not thereafter inform Westwood of the arrangements *606 made with H & S Construction. He stated that Westwood did not impose a time limit within which to complete the corrective work. Also, neither Amar or Arender informed him that Westwood would actively solicit a contractor to do the corrective work. He did not speak again with anyone representing Westwood until sometime in July.
Leger further explained that, on July 9, he returned to the construction site and observed a James Construction milling machine. He spoke to Patrick Morein, a James Construction employee, then returned to his office. That day, Leger called H & S Construction to advise them to not do the milling work because it had already been done. Thereafter, Leger had no contact with Westwood's Amar or Arender.
On July 17, Big "D" filed a notification of contract dispute with the DOTD seeking payment of the total amount owed, $13,455.00. The dispute form states that, on July 17, Big "D" contacted Westwood to notify them that it would begin milling operations in the next week. This statement indirectly contradicts Leger's testimony that, on July 9, he knew the work was being done by James Construction. On July 28, Big "D" filed a lien against Westwood and American Bonding in the Evangeline Parish public records.
Kathy Wheller,[1] Big "D"'s office manager, also testified at trial. She stated that, at some point around July 10, Arender informed her that James Construction had already done the milling work. This conversation took place when she called Arender to inform him that H & S Construction would do the work. She did not recall receiving any notice from Westwood with regard to its hiring of James Construction to do the milling work. She then contradicted her prior testimony by stating that the DOTD contract dispute form, which reflected that July 17 was the date upon which Big "D" discovered that Westwood hired James Construction, accurately represented what had occurred.
Amar testified on behalf of Westwood. Her version of the events was different from that of Leger and Wheller. She stated that at the May 20 lunch meeting, Leger told her that there was no way for him to do the milling work because he did not have the proper equipment. Leger allegedly then stated he wanted to talk to Deranger first to try to change Deranger's decision to reject his work.
On May 26, Amar spoke to Deranger, who had not changed his mind. She called Leger to inform him of this, and Leger allegedly said that he would try to contact James Construction to do the milling work. On June 3, Amar spoke to Leger and told him she would call James Construction herself. The next day, she spoke to Leger again and informed him that she would try to keep the price of the milling below $6,000.00 so that Leger would not lose money. At the time, Big "D" had spent approximately $7,000.00 on the project for which it was to receive $13,455.00. Amar hired James Construction to mill and overlay the entire work area defectively performed by Big "D", not just 40 feet on each side of the bridge.
On June 15, Amar told Leger that James Construction would mill the road surface during the first week in July. According to Amar, Leger did not respond `one way or the other" to this information. According to Amar, once she told Leger that she had hired James Construction, she did not think it was necessary to call him again or to confirm the hiring with Leger in writing. It was her impression that Leger agreed with the hiring of James Construction. James Construction began milling operations on July 3 and completed the overlay on July 9 and 10. In mid-July, Wheller informed Amar of the lien and the contract dispute.
At the time of these events, Ellis Fontenot was employed as an engineer by H & S Construction. He stated that, on May 20, Leger contacted him to request H & S Construction's services to mill and overlay 40 feet of the bridge approaches. He told Leger that H & S Construction would not be able to do the work until after July 1. Fontenot recalled setting up the week of July 4 for the work.
*607 Deranger, the project engineer, testified that Big "D"'s work was "obviously unacceptable" in its entirety. He denied telling Leger that only 40 feet on each side of the bridge needed milling. According to Deranger, the entire work of Big "D" required milling and overlay. He also explained that DOTD does not tell the contractors how to correct unacceptable work. DOTD only informs them of the nonacceptance and that correction is necessary.

OPINION
In its first assignment of error, Big "D" contends that the trial court failed to apply the contract termination provision of the subcontract. Big "D" urges that Westwood's failure to comply with the seven-day written notice provision of paragraph 22 amounts to a breach of contract for which Westwood is liable to Big "D" in damages. Westwood counters that the strict notice requirement of paragraph 22 was modified by a subsequent oral agreement between the parties. The provision in question provides, in pertinent part, as follows:
TERMINATION OF CONTRACT
22. It is understood that time is of the essence of this contract.... The Subcontractor agrees to commence and to prosecute his work, and the several parts thereof, at such times and in such order as the Contractor considers necessary to keep the same sufficiently in advance of the other parts of the building and to avoid any delay in the completion of the construction as a whole. The Subcontractor shall reimburse the Contractor for any loss or damage, including but not restricted to any liquidated damages which may become due the Owner under the General Contract, and extra expense paid or incurred by the Contractor which is due to (a) Subcontractor's failure to deliver any and all materials and/or (b) Subcontractor's failure to properly perform any and all work in keeping with the progress of the general construction work, and/or to properly perform any term, covenant or condition contained in this Subcontract. If the Subcontractor fails or refuses to proceed with his work as directed by the Contractor, the Contractor shall notify the Subcontractor by written notice of his failure to comply and shall allow seven (7) days from the date the notification was mailed for the Subcontractor to comply with the terms of the notification.... If Contractor determines that the Subcontractor has not remedied and cured the default or defaults in his performance within said seven (7) days, then the Contractor may take any steps the Contractor deems advisable to secure any labor, materials, equipment and services, and shall have a lien on and may take over all of the Subcontractor's equipment, tools, appliances, and materials on this project and prosecute the work to completion. (Emphasis ours.)
The record indicates that plaintiff's counsel urged the defendant's breach of this provision at the close of the evidence, just moments prior to the trial judge's oral ruling from the bench. Westwood's counsel briefly argued that the contract was never terminated and that, under this provision, the subcontractor is obligated to pay for any loss resulting from his failure to properly perform the work.
Contracts have the effect of law for the parties. La.C.C. art. 1983. Interpretation of a contract is the determination of the common intent of the parties, and where the words utilized are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La.C.C. arts. 2045, 2046. Contract provisions must be interpreted in light of each other to give the meaning suggested by the contract as a whole. La.C.C. art. 2050.
It is undisputed that the work of Big "D" was unacceptable to the DOTD, i.e., it was defective. Pursuant to the third sentence quoted above, Big "D" is obligated to "reimburse" Westwood for "loss or damage" due to Big "D"'s "failure to properly perform any and all work." Clearly, under these explicit terms, Big "D" is liable for the cost of repairing its defective work.
However, Big "D" asserts that Westwood's failure to comply with the highlighted portion *608 of this provision constituted breach of the subcontract. Further, Big "D" argues that, had Westwood complied with this requirement, Big "D" would have contracted with H & S Construction to do the corrective work for substantially less cost than James Construction charged Westwood. It is undisputed that all negotiations concerning the correction of Big "D"'s defective work were oral in nature. The issue before us is whether these oral discussions were sufficient to constitute a modification of the written contract provision concerning seven-day written notice. In other words, was Westwood absolutely obligated to provide Big "D" with written notice or did the parties, by orally discussing remediation options, thereby waive the written notice requirement?
In Pelican Electrical Contractors v. Neumeyer, 419 So.2d 1, 5 (La.App. 4 Cir.), writ denied, 423 So.2d 1150 (La.1982), the fourth circuit held that:
[W]ritten contracts for construction may be modified by oral contracts and by the conduct of the parties, and this is true even when the written contract contains the provision that an owner is liable only if the change orders are in writing. Pamper Corporation v. Town of Marksville, 208 So.2d 715 (La.App. 3rd Cir.1968), writ denied, 252 La. 271, 210 So.2d 509 (1968). It is a question of fact, therefore, as to whether there were oral agreements that modified the written contract.
The party asserting modification of an obligation must prove by a preponderance of the evidence facts or acts giving rise to the modification. La.C.C. art. 1831; Wisinger v. Casten, 550 So.2d 685 (La.App. 2 Cir.1989). Pursuant to La.C.C. art. 1848, parol evidence is admissible for this purpose. Additionally, modification can be presumed by silence, inaction, or implication. Professional Construction Services, Inc. v. Lee M. Marcello Contractor, Inc., 550 So.2d 968 (La.App. 5 Cir.1989), writ denied, 556 So.2d 36 (La. 1990), citing Bank of Louisiana in New Orleans v. Campbell, 329 So.2d 235 (La.App. 4 Cir.), writ denied, 332 So.2d 866 (La.1976).
Our review of the trial court's oral reasons for judgment and its judgment reveals that the trial court did not specifically mention plaintiff's claim for breach of contract based on defendant's failure to give the written notice contemplated by paragraph 22. Under these circumstances, Big "D"'s demands are, for purposes of appeal, presumed to have been rejected by the trial court. Plunkett v. D & L Family Pharmacy, Inc., 562 So.2d 1048 (La.App. 3 Cir.1990); Hatcher v. State, DOTD, 478 So.2d 774 (La.App. 3 Cir.), writ denied, 479 So.2d 923 (La.1985).
We conclude that, through their actions and oral discussions, Big "D" and Westwood modified the written notice requirement to, in effect, do away with it's necessity. Big "D" was orally notified by Amar of the DOTD rejection on May 14. Leger attended the May 20 meeting where he was personally told by DOTD engineers that his work was not acceptable. Thereafter, Leger, Amar, and Arender held a lunch meeting at which possible remedial measures were discussed. While it may not have been his direct obligation to do so, Leger never did ask for or insist that Big "D" be given written notice of the defects while these meetings were taking place. Even if Westwood had voluntarily complied with the strict written notice formality of the contract, Big "D" would have only had seven (7) days from the date of mailing of said notice within which to remedy and cure the defects. In other words, Big "D"'s corrections would have been done by early June at the latest. The fact that Leger scheduled H & S Construction to do the remedial work in July (over six weeks after he received oral notice of the defective nature of his work) belies Big "D"'s contention that written notice was absolutely required and that this contractual provision was not modified by a subsequent oral agreement. Additionally, Big "D"'s position is undermined by the fact that, after scheduling H & S Construction to do the remedial work, Leger thereafter failed to even attempt to communicate with Westwood until after he discovered James Construction had done the job. Under these circumstances, it is clear that the parties modified the written notice requirement of the contract.
Big "D" next contends that the trial court erred in failing to award penalties and attorney fees for Westwood's failure to pay *609 Big "D" the undisputed amount within 14 days of payment from DOTD. Big "D" relies upon La.R.S. 9:2784(C), which provides:
If the contractor or subcontractor without reasonable cause fails to make any payment to his subcontractors and suppliers within fourteen consecutive days of the receipt of payment from the owner for improvements to an immovable, the contractor or subcontractor shall pay to the subcontractors and suppliers, in addition to the payment, a penalty in the amount of one-half of one percent of the amount due, per day, from the expiration of the period allowed herein for payment after the receipt of payment from the owner. The total penalty shall not exceed fifteen percent of the outstanding balance due. In addition, the contractor or subcontractor shall be liable for reasonable attorney fees for the collection of the payments due the subcontractors and suppliers. However, any claim which the court finds to be without merit shall subject the claimant to all reasonable costs and attorney fees for the defense against such claim.
It is unclear from the record precisely when DOTD paid Westwood. It is also unclear whether DOTD accepted the work in October, 1992 or January, 1993. By letter dated October 1, 1992, Westwood offered to pay the undisputed amount, $7,915.07, upon Big "D"'s cancellation of the lien. It is unclear how Big "D" responded. Westwood deposited the undisputed amount into the court's registry in conjunction with the filing of its answer on September 23, 1993.
At trial, the burden of proof rests with the claimant seeking recovery to present sufficient evidence to establish by a preponderance of the evidence the facts necessary for it to recover. Plaintiff failed to do so. The absent evidence could reasonably have been discovered before trial and presented at the trial. Big "D" simply failed to present sufficient evidence to establish its entitlement to penalties and attorney fees pursuant to La.R.S. 9:2784(C).

DECREE
For the above and foregoing reasons, we affirm the judgment of the trial court rendered in favor of Westwood, Incorporated and American Bonding Company against Big "D" Dirt Services, Inc.
All costs of these proceedings are assessed to plaintiff-appellant, Big "D" Dirt Services, Inc.
AFFIRMED.
NOTES
[1] This witness' surname was spelled at least five different ways in the transcript. We shall identify her as "Wheller" as her name first appears in the hearing transcript.