762 So.2d 1223 (2000)
L & A CONTRACTING COMPANY, INC.
v.
RAM INDUSTRIAL COATINGS, INC. and Transamerica Premier Insurance Company.
No. 99 CA 0354.
Court of Appeal of Louisiana, First Circuit.
June 23, 2000.
*1225 Murphy J. Foster, III, Steven B. Loeb, Baton Rouge, for Plaintiffs-Appellees L & A Contracting Company and Fidelity and Deposit Company of Maryland.
Kurt S. Blankenship, Raymond A. Daigle, Jr., Metairie, for Defendants-Appellants Ram Coating Technology Corporation, (as Successor-In-Interest to Ram *1226 Industrial Coatings, Inc.), and its Successor, Waste Technology Corporation, Inc. and Transamerica Premier Insurance Company.
Before: FOIL, WHIPPLE, and GUIDRY, JJ.
GUIDRY, J.
Appellants, Waste Technology Corporation, Inc. (Waste), successor-in-interest to Ram Coating Technology (Ram Coating), and Transamerica Premier Insurance Company (Transamerica), seek review of the lower court's judgment awarding breach of contract damages to appellee, L & A Contracting Company, Inc (L & A).

FACTS
In 1989, the Louisiana Department of Transportation and Development (DOTD) advertised for public bid a project involving the renovation of Miller's Bluff Bridge in Bossier Parish. The Miller's Bluff Bridge is a large bridge composed of two approach spans and five center trusses described as "camelbacks" or "camel's humps" because of the high-arching, curved shape of each truss. The center trusses and approach spans were further divided into sub-units, also referred to as spans, and numbered sequentially from one to twenty-two in a west to east direction. The layout of the bridge can basically be divided into three sections: the west approach, comprised of spans one to six; the east approach, comprised of spans twelve to twenty-two; and the superstructure, comprised of the five trusses labeled as spans seven to eleven.
L & A solicited bids from several companies to perform the subcontracting work on the project. One of the work assignments for which L & A was seeking subcontract bids was for the cleaning and painting of new steel used in refurbishing the bridge as well as for cleaning and repainting the existing steel. L & A successfully bid on the project. DOTD entered into a contract with L & A on August 2, 1989 for the work to be performed. Thereafter, L & A entered into a subcontract with Ram Industrial Coating, Inc. (Ram Industrial) on October 2, 1989. The subcontract was substantially based on the bid response submitted by Ram Industrial. The price listed in the subcontract was $410,399.00. Furthermore, the subcontract provided that L & A would release and hold Ram Industrial harmless if in fact DOTD did not approve the sublet.
On December 6, 1989, Ram Industrial was issued a contractor's license by the state licensing board. DOTD approved Ram Industrial to perform the subcontract work on the project on January 16, 1990. Because of the public nature of the project, no company could perform any work on the project without first receiving the pre-approval of DOTD.
Shortly after being granted the subcontract for cleaning and painting on the project, Ram Industrial sent a letter to L & A requesting that the amount of its bid be increased by $9,840.00, or that the requirement that it obtain payment and performance bonds be waived in light of the fact it had inadvertently overlooked this requirement and, therefore, did not include the costs of these bonds in its bid price. L & A rejected this offer, but instead offered to secure the bonds on Ram Industrial's behalf, with the costs of the bonds being deducted from the first progress payment, called pay estimates, made to Ram Industrial. On May 10, 1990, performance and payment bonds were issued to Ram Industrial by Transamerica.
In the meantime, disputes arose between DOTD and L & A which delayed commencement of the project and resulted in Ram Industrial not being ordered to commence its work until September of 1991. Prior to being ordered to commence work, on November 16, 1990, C.B. Roth, president and owner of Ram Industrial sent a letter to L & A discussing the costs of the delay in commencing the subcontract work and inquiring as to how soon it would be before they could commence said *1227 work. He also stated in the letter the company's former expectation to have commenced the work in the third or fourth quarter of 1989, when the job was bid.
On September 17, 1991, C.B. Roth sent L & A a letter to inform it that his company would be mobilizing to the project site on September 18, 1991. In that letter, he again expressed concerns about the additional costs to his company caused by the nearly two-year delay, and he also expressed concern about the new steel installed in the bridge being in a raw (unprimed) condition, in derogation of the DOTD specifications. Nevertheless, on September 18, 1991, the company mobilized to the jobsite and commenced the work.
However, prior to mobilizing to the jobsite in September 1991, Ram Industrial had negotiated a corporate takeover due to the financial problems the corporation was experiencing. Specifically, in 1989, Ram Industrial reported a $100,000.00 income loss and in 1990, the figure had doubled to $200,000.00. Therefore, in April 1991, arrangements were made with Waste, the parent company of Ram Coating, to have Ram Coating purchase all of the assets and liabilities of Ram Industrial. All of the same employees and the same management personnel would continue in the employ of Ram Coating in the same positions and capacities as held with Ram Industrial. This included C.B. Roth, who retained the position of president in the newly formed company, although he no longer held an ownership interest. For this reason, and allegedly unbeknownst to L & A, Ram Coating, rather than Ram Industrial, mobilized to the jobsite in September 1991. Ram Industrial was dissolved as a corporate entity on October 11, 1991.
Despite the complaints concerning the delay in starting the project and the extra work presented by the use of unprimed, new steel on the job, Ram Coating commenced operations without having resolved these two issues. Under the original (base) subcontract, all old or existing steel was required to be cleaned and then repainted. The process used to clean the steel consisted of sandblasting the steel to remove old paint and more importantly, any rust deposits that may have developed on the steel. After the cleaning was completed, the steel would be repainted to protect it against rust which could corrode the metal and compromise the structural integrity of the bridge.
The new steel used in the project was used to replace those of portions of existing steel that were too corroded to salvage. According to the Louisiana Standard Specifications for Roads and Bridges, 1982 edition (commonly referred to as the "gold book"), all new steel used was to be shop primed before arriving at the jobsite. However, the new steel supplied for the Miller's Bluff Bridge project was unprimed steel. Ram Coating employees were requested by L & A to "field prime" all the steel used on the project.
In the time period from September 1991 to December 1991, Ram Coating completed all of the work required on the approach spans and was starting to work on span 11 in one of the center trusses when the company demobilized for the winter months.[1] According to the "gold book," painting was prohibited when ambient air temperatures were less than 45 degrees Fahrenheit and humidity was higher than 85 percent, which temperatures are typical of the southeast in the winter months. Furthermore, lay and expert witnesses for both sides testified that such demobilization is typical of the painting industry in Louisiana.
Ram Coating remobilized to the jobsite in March 1992, and around that same time, L & A began to receive notices of unpaid invoices from creditors who had supplied *1228 equipment and material to Ram Coating in conjunction with the Miller's Bluff Bridge assignment. Some of the companies had filed materialmen's liens against L & A in conjunction with these unpaid bills. L & A began to retain funds from the pay estimates it sent to Ram Coating to cover the amounts owed of which it had been made aware and sent correspondence to Ram Coating questioning it concerning these complaints. In response, Ram Coating authorized L & A to use the retained funds to pay creditors and explained that because L & A was tardy in paying Ram Coating for the extra work it was performing, Ram Coating was not able to timely pay its creditors.
At the same time, L & A noted that Ram Coating's progress in completing the subcontract work had significantly decreased. On March 31, 1992, counsel for L & A sent a written demand letter to Ram Coating, in accordance with contractual provisions, requesting that there be a marked increase in Ram Coating's rate of production or L & A would place the company in default on April 6, 1992, and demand that Transamerica complete the job and indemnify L & A for all losses.
On April 6, 1992, Ray Sims, vice president of L & A, faxed Ram Coating and Transamerica to notify both companies that L & A was placing Ram Coating in default for failure to make any noticeable progress since its demand letter of March 31, 1992. He then requested that Transamerica have a crew in place to complete the work by April 13, 1992, at 8:00 am, or L & A would undertake to have the job completed, holding Ram Coating and Transamerica liable for all damages resulting therefrom. Transamerica sought to negotiate with L & A to allow Ram Coating to return to the job and complete the work within a sixty-day time frame and for the remaining funds due under the contract. This offer was refused and L & A placed Transamerica in default as of 5:00 pm, C.S.T. on May 1, 1992.
L & A subsequently sought bids to complete the painting and cleaning work on the project. On May 22, 1992, L & A entered into a subcontract with Global Construction Company, Inc. (Global) to complete the painting and cleaning work for a contract price of $536,880.00. Global completed the subcontract work on September 2, 1992, and DOTD accepted the completed project on September 20, 1992.

PROCEDURAL HISTORY
On July 2, 1992, L & A filed suit against Ram Industrial and Transamerica for damages resulting from the alleged breach of the subcontract. Ram Coating answered the petition on July 23, 1992, and filed a reconventional demand for sums purportedly owed to it by L & A. On August 11, 1992, Transamerica answered the petition, generally denying the allegations of the petition. L & A filed an answer to the reconventional demand made by Ram Coating on September 11, 1992.
On May 14, 1992, L & A filed a motion for summary judgment seeking dismissal of the reconventional demand filed by Ram Coating. In the motion, L & A argued that Ram Coating had been administratively dissolved on October 9, 1992, and therefore lacked procedural capacity to bring the reconventional demand since it was not a juridical person. According to a minute entry for August 27, 1993, L & A's motion for summary judgment was converted to an exception of no right of action, to which Ram Coating consented to the trial court's sustaining of the exception. Ram Coating was then given thirty days to amend their reconventional demand.
On September 27, 1993, Ram Coating was given leave to amend and supplement its answer and reconventional demand by substituting Waste as the plaintiff-in-reconvention based on Waste being the sole shareholder and successor of Ram Coating which was administratively dissolved as a corporation on October 9, 1992. On that same date, Transamerica was given leave *1229 to file its reconventional demand against L & A.
On October 29, 1993, L & A again sought to have the reconventional demands filed against it dismissed by filing exceptions of lack of procedural capacity, no right of action and no cause of action. In urging the exceptions of lack of procedural capacity, L & A again raised the fact that Ram Coating had been dissolved as a corporation in 1992. Further, L & A argued that because both Ram Coating and Waste had never been authorized to do business in Louisiana, nor had either company ever secured a license to operate as a contractor, both companies had no right to bring the action in reconvention. Finally, L & A argued that Transamerica, in its petition in reconvention, failed to state sufficient facts upon which to find that it had a right or cause of action in reconvention. On February 10, 1994, the trial court issued a judgment denying all of the exceptions raised.
At the commencement of the trial in this matter, L & A again moved for the dismissal of the reconventional demands. The trial judge denied the motion in open court on February 9, 1998. The trial on the merits then followed from February 9-12, 1998. On July 16, 1998, a judgment was signed in favor of L & A and against Transamerica and Waste, jointly, wherein they were ordered to pay "$250,194.00 in damages plus legal interest from the date of judicial demand until paid, plus all costs" of the proceedings. Furthermore, the two companies were ordered to pay attorney's fees in the amount of $110,000.00, plus legal interest accruing from the date of the judgment. The reconventional demands filed against L & A were dismissed with prejudice.
A motion for new trial was filed by Waste and Transamerica on July 27, 1998, and said motion was denied on September 25, 1998. On October 26, 1998, Transamerica filed a motion for suspensive appeal of the judgment and Waste filed a motion for a devolutive appeal on November 16, 1998. L & A answered the appeal requesting additional damages.

ASSIGNMENTS OF ERROR
On appeal, Waste and Transamerica raise the following assignments of error:
I. The trial court erred in concluding that Appellant materially breached the subcontract agreement.
II. The trial court erred in its damage award to Appellee.
III. The trial court erred in awarding attorney's fees under the subcontract agreement and erred in awarding attorney's fees against Transamerica.
IV. The trial court erred in awarding excessive attorney's fees.
V. The trial court erred in rendering an award against Transamerica in excess of the penal amount of the bond.
L & A answered the appeal and in its answer, requested that this court modify, revise or reverse the judgment of the trial court to award L & A additional damages in the following respects: $92,238.35 for home office overhead, $80,685.35 for direct job site extended costs, $32,503.42 for additional materials supplied by L & A, and for legal interest running from the date of breach of contract rather than from judicial demand.

DISCUSSION

Breach of Contract
In its written reasons for judgment, the trial court found that Ram Coating had breached the subcontract in four respects: (1) assigning the subcontract without receiving the prior written approval of L & A; (2) failing to pay suppliers for materials and equipment used; (3) failing to make adequate progress upon remobilizing to the jobsite in March 1992; and (4) failing to complete the subcontract work within 180 days.

*1230 Assignment of the Subcontract

Section seven of the subcontract between L & A and Ram Industrial contains the following restriction:
Section 7. The Subcontractor represents and agrees that he will perform all the work specified to be done under this subcontract, and that he will not subcontract any part of the such work to any other person or assign any portion of this subcontract agreement, except with the prior written approval of the contractor.
Ram Coating argues that the transfer of the contract from Ram Industrial to Ram Coating was not an assignment, but merely a corporate name change as evidenced by the continuation of the same employees and management. We disagree. C.B. Roth, founder and president of Ram Industrial, and later, president of Ram Coating, testified that all the assets and liabilities of Ram Industrial were sold. A new company, Ram Coating, was formed by Waste for the sole purpose of purchasing the assets and liabilities of Ram Industrial. Six months later, on October 11, 1991, Ram Industrial was dissolved as a corporate entity.
The trial court was not clearly wrong in finding, based on these facts, that more than a mere name change took place; the subcontract, as part of the assets (or liabilities, as the case may be) possessed by Ram Industrial was assigned to Ram Coating in clear violation of the aforementioned contractual provision. Legal agreements have the effect of law upon the parties, and as they bind themselves, parties shall be held to a full performance of obligations flowing therefrom. Quinn-L Corporation v. Elkins, 519 So.2d 1164, 1174 (La.App. 1st Cir.1987), writ dismissed, 520 So.2d 415 (La.1988). Contracts must be performed in good faith. La. C.C. art. 1983; Diamond B Construction Company, Inc. v. City of Plaquemine, 95-1979, p. 4 (La.App. 1st Cir.4/30/96), 673 So.2d 636, 639. Adhering to these principles, section seven of the subcontract was violated when Ram Industrial sold its assets, including the subcontract at issue, to Ram Coating, thereby actively breaching the subcontract and subjecting itself to liability.
Ram Coating argues on appeal that although it may have technically breached the subcontract, liability should not attach, based on L & A's failure to raise the breach at the time it occurred. This argument lacks merit for the following reasons. First, evidence presented at trial proved that not only was L & A unaware of the change in subcontractors, but some of the employees of Ram Industrial/Ram Coating were equally unaware of the change. Lee Sims, vice president of L & A at the time of trial, stated that his company did not discover the change in companies until after placing Ram Coating in default in April 1992. He further stated that no one at the company had any reason to believe the subcontract had been assigned because they still dealt with the same people, working in the same capacities, as were employed by Ram Industrial. Finally, when questioned concerning correspondence L & A had received, Lee Sims noted that on some of the correspondence received, subsequent to Ram Coating mobilizing on the job, Ram Industrial was still named on the letterhead.
Further, in its arguments alleging waiver of the breach, Ram Coating points out a March 10, 1992 letter to Russell Tull, of Cecil W. Powell and Company, from H.G. Morgan of L & A, in which Mr. Morgan states that L & A was recently made aware of the fact that Ram Industrial might be obtaining materials and supplies under names other than Ram Industrial. However, Lee Sims testified that L & A was aware that Ram Industrial was also acquiring materials under the name Eagle Tank Technology, Inc. and therefore, did not find this fact to be of any consequence. Considering the evidence presented, the trial court was not manifestly erroneous in finding that Ram Coating presented insufficient *1231 proof of any alleged waiver of this breach by L & A.

Failure to Pay Suppliers/Failure to Make Sufficient Progress after Remobilization
Ram Coating refers to three incidents in defense of its failure to pay suppliers and its failure to make sufficient progress in completing the work assigned when it remobilized to the jobsite in March 1992:(1) the nearly two-year delay from the date L & A sublet the contract to Ram Industrial to the date Ram Coating finally mobilized to the jobsite; (2) the time, expense and labor required to perform the additional work presented in priming the new steel; and (3) the deduction of retainage amounts from pay estimates issued to Ram Coating.
In regards to the first defense raised by Ram Coating, we make reference to the following portion of section four of the subcontract:
It is understood that the contractor does not assure the subcontractor that the subcontractor will be able to commence, prosecute or complete the subcontractor's work at the time stated in any progress schedule, or that the entire work called for by the principal contract shall be completed at such fixed time, it being the obligation of the subcontractor to coordinate its work with that of the contractor and other subcontractors.
A broad interpretation of this provision would be sufficient in excusing L & A's delay in ordering Ram Industrial to commence work on the sublet assignment. However, even without such broad interpretation, several other facts in the record negate this defense raised by Ram Coating. First of all, the delay was not the result of any unilateral or bad faith act on the part of L & A, but rather was the result of a genuine dispute between the DOTD and L & A, as has been freely acknowledged by Ram Coating.
Furthermore, although it may have been logical for Ram Industrial to assume that work on the project would commence soon after it entered into the subcontract with L & A, there is no specific contractual provision mandating that the work commence as of a certain date, in spite of repeated references to "time being of the essence" in the subcontract. And finally, even though C.B. Roth stated in his November 16, 1990 letter to L & A that it was Ram Industrial's intention to have commenced work on the project in the third or fourth quarter of 1989, the facts indicate that such an assumption was impractical. As the record clearly discloses, Ram Industrial did not sign the subcontract until October 2, 1989; Ram Industrial did not receive its Louisiana contractor's license until December 6, 1989; L & A's sublet to Ram Industrial was not approved by DOTD until January 16, 1990; the payment and performance bonds required under the subcontract were not issued to Ram Industrial until May 10, 1990; and finally, L & A did not sign the subcontract until June 1990. Therefore, the earliest Ram Industrial would have been able to commence the work was in June 1990.
Nonetheless, L & A acknowledged that Ram Industrial could have had some damage claims to assert based on the delay in commencing the project and therefore, it requested on several occasions that Ram Industrial submit any pass-through claims it might have to L & A, as was required by DOTD regulations, so that L & A could submit the same to DOTD for its consideration. In addition to inquiring about such claims, L & A expressly stated that Ram Industrial's failure to timely submit its pass-through claims to L & A would result in the waiver of those claims by Ram Industrial. No claims were ever submitted by Ram Industrial or Ram Coating.
Despite these facts, Ram Coating asserts that the two-year delay hurt the company financially because the costs stated in its bid had increased, due to inflation, in the intervening time interval and, therefore, were no longer accurate. Furthermore, Ram Coating alleges that it incurred additional expenses in the form of increased *1232 labor costs because, during the lengthy time interval, the local labor union, from which it had planned to secure a majority of its labor force, had disbanded and, therefore, Ram Coating was forced to use company and out-of-town laborers which resulted in additional expenses in the form of per diems, hotel costs and travel allowances.
The trial court, however, did not find the reasons argued by Ram Coating to be sufficient to justify its breach of section ten of the subcontract, wherein Ram Industrial agreed to "promptly pay all persons furnishing labor, materials, equipment or supplies therefore, in connection with or pertaining to the subcontract work[.]" Cf. M.S. Rau, Inc. v. Gibson Roofers, Inc., 94-2496, p. 4 (La.App. 4th Cir.4/26/95), 657 So.2d 102, 105, writ denied, 95-1718 (La.10/13/95), 661 So.2d 498. Considering the evidence presented regarding the circumstances surrounding Ram Coating's ability to mobilize to the jobsite and the applicable provision of the subcontract, we cannot say that the trial court was manifestly erroneous in its conclusion.
Ram Coating also alleges that its tardiness and/or failure to pay suppliers was the result of L & A requiring Ram Coating to perform additional work, in the form of priming the new steel, which was beyond the scope of the subcontract. The trial judge found that the work performed by Ram Coating in priming the new steel was additional work not encompassed within the scope of the subcontract. We agree.
Ram Coating goes on to argue that L & A's failure to timely compensate it for this additional work was another reason why it was unable to promptly pay its suppliers. Despite this argument, the trial court found that Ram Coating actively breached the subcontract. Based on the following reasons, we cannot say that the trial court was clearly wrong in so finding. First, when Ram Coating mobilized to the worksite in September 1991, it was aware of the fact that new, unprimed steel was being used and had been installed on the bridge. Confirmation of Ram Coating's knowledge of this fact is found in the September 17, 1991 letter from C.B. Roth to L & A. Therefore, Ram Coating's mobilization to the jobsite and its actions in priming the steel without first obtaining oral or written modification of the original contract could be seen as Ram Coating's acquiescence to performing the additional work, thereby modifying the contract.
A contract may be modified only by mutual consent. River Oaks, Inc. v. Blue Cross of Louisiana/Louisiana Health Service & Indemnity Company, 595 So.2d 785, 787 (La.App. 5th Cir.), writ denied, 598 So.2d 361 (La.1992). While modification can be presumed by silence, inaction, or implication, one person may not change the terms unilaterally. Wise v. Lapworth, 614 So.2d 728, 731 (La.App. 5th Cir.1993).
In Pelican Electrical Contractors v. Neumeyer, 419 So.2d 1, 5 (La.App. 4th Cir.), writ denied, 423 So.2d 1150 (La. 1982), the fourth circuit stated that:
[W]ritten contracts for construction may be modified by oral contracts and by the conduct of the parties, and this is true even when the written contract contains the provision that an owner is liable only if the change orders are in writing. Pamper Corporation v. Town of Marksville, 208 So.2d 715 (La.App. 3rd Cir. 1968), writ denied, 252 La. 271, 210 So.2d 509 (1968). It is a question of fact, therefore, as to whether there were oral agreements that modified the written contract.
The trial court found that the subcontract between L & A and Ram Industrial did not entail the priming of the new steel and that the parties agreed that Ram Coating would be paid $100,000.00 for this additional work. Furthermore, a stipulation was entered at the commencement of the trial to this effect. This stipulation, plus the testimony presented confirming this agreement, is proof that the subcontract was modified to incorporate the additional *1233 work required in priming the new steel. The record discloses that this agreement was formed during a December 3, 1991 meeting between L & A and Ram Coating.
Nevertheless, both sides claim that the modification regarding the raw steel encompassed more than just an agreement as to the amount of compensation.
The party asserting modification of an obligation must prove by a preponderance of the evidence facts or acts giving rise to the modification. La. C.C. art. 1831; Big "D" Dirt Services, Inc. v. Westwood, Inc., 94-1234, p. 8 (La.App. 3rd Cir.3/1/95), 653 So.2d 604, 608; Wisinger v. Casten, 550 So.2d 685, 687 (La.App. 2nd Cir.1989). C.B. Roth stated at trial that L & A had agreed to pay Ram Coating the full sum due for the extra work in thirty days. Lee Sims and Joseph Clemmons of L & A, on the other hand, contend that not only was the agreement that Ram Coating would be paid the $100,000.00 when the entire subcontract work was completed, they further alleged that the agreement included a promise by Ram Coating to waive all claims, if any, it had against L & A, and a promise to complete the remainder of the cleaning and painting work within sixty days of remobilizing to the job site.
The trial court found that "no agreement was confected as to when payment was due." We agree with the trial court's finding that the written subcontract was orally modified only to the extent that it encompassed the extra work presented by the raw steel at the additional cost of $100,000.00. See Professional Construction Services, Inc. v. Lee M. Marcello Contractor, Inc., 550 So.2d 968, 972 (La.App. 5th Cir.1989), writ denied, 556 So.2d 36 (La.1990). Therefore, the trial court was not clearly wrong in determining that Ram Coating was without justification for violating section ten of the subcontract. The consequences of Ram Coating engaging in the additional work and obtaining materials and supplies to perform such work, without first confirming or securing the means to pay the costs associated with the additional work, must be borne by Ram Coating alone.
The final justification that Ram Coating raises as a basis for its financial inability to pay suppliers is the alleged violation, by L & A, of section nine of the subcontract which declares that the contractor agrees to pay the subcontractor in the "same manner and proportion in which the contractor is paid by the owner." Certain of the pay estimates introduced into evidence at trial, in addition to the testimony of Lee Sims, show that certain amounts were deducted from Ram Coating's pay estimates as "retainage." Moreover, payments to L & A from DOTD did not evidence the withholding of such retainage. Therefore, Ram Coating alleges that L & A should be found in violation of section nine of the subcontract based on its actions of retaining amounts from Ram Coating's pay estimates, when an equal percentage had not been withheld from payments made to L & A by DOTD.
This argument raised by Ram Coating lacks merit for the following reason: L & A secured a retainage bond so that such amounts would not be deducted from the amounts it received from DOTD. Ram Coating did not likewise secure such a bond to ensure that such sums were not deducted from its pay estimates. The retainage bond obtained by L & A was equal to the amount the DOTD would have withheld from its payments to L & A if the bond had not been offered instead.
In regards to the third manner in which the trial court found that Ram Coating had breached the subcontract, the court had this to say:
The Court believes [Ram Coating] was underfunded in March, 1992, when it remobilized and simply could not employ the necessary manpower to complete the contract timely. This led to [Ram Coating] failing to provide adequate equipment and failing to maintain workers compensation insurance in April of 1992 *1234 when [Ram Coating] was prohibited by L & A and the State from working on the project.
We agree with this finding by the trial court. Although Ram Coating alleges that the underfunding was a result of the delay and L & A's failure to timely remit payment of the $100,000.00 in compensation for the additional raw steel work, for the reasons previously stated, we see no reason to disturb the findings of the trial court on this issue.

Term for Completion: 180 days
We initially note that this final ground for breach involves a question of law for which this court must determine if the trial court was legally correct or legally incorrect. When appellate review is not premised upon any factual findings made at the trial level, but is, instead, based upon an independent review and examination of the contract on its face, the manifest error rule does not apply. Hawco Manufacturing Co., Inc. v. Superior Chain, Inc., 98-1037, pp. 4-5 (La.App. 1st Cir.9/24/99), 754 So.2d 1062, 1066; Amoco Production Company v. Fina Oil & Chemical Company, 95-1185, p. 13 (La.App. 1st Cir.2/23/96), 670 So.2d 502, 512, writ denied, 96-1024 (La.5/31/96), 673 So.2d 1037; Conoco, Inc. v. Tenneco, Inc., 524 So.2d 1305, 1312 (La.App. 3rd Cir.), writ denied, 525 So.2d 1048 (La.1988). In such cases, appellate review of questions of law is simply whether the trial court was legally correct or legally incorrect. Borden, Inc. v. Gulf States Utilities Company, 543 So.2d 924, 928 (La.App. 1st Cir.), writ denied, 545 So.2d 1041 (La.1989).
The trial judge found, as a matter of law, that the subcontract contained a term for performance of 180 calendar days which Ram Coating breached. A review of the subcontract reveals no such provision requiring that Ram Industrial complete the work agreed upon within a 180 calendar day period. Nonetheless, the trial court stated that the subcontract "encompassed the bid submitted to L & A by Ram [Industrial] on May 31, 1989" and that Ram Coating "failed to complete the project within 180 calendar days as called for by the contract." We disagree with this finding by the trial court because the trial court obviously predicated its ruling upon the assumption that the subcontract incorporated the bid proposal submitted by Ram Coating.
As a general rule of contract law, separate documents may be incorporated into a contract by attachment or reference thereto. Russellville Steel Co., Inc. v. A & R Excavating, Inc., 624 So.2d 11, 13 (La. App. 5th Cir.1993). Without question, a 180-day term for completion was proposed in Ram Industrial's bid to L & A. However, L & A failed to incorporate that term into the resulting subcontract; furthermore no evidence was presented to prove that Ram Industrial's bid was attached to the subcontract. Consequently, the trial court was legally incorrect in finding that the subcontract mandated a 180-day term of performance based on the encompassment of the bid within the subcontract. Cf. Kuswa & Associates, Inc. v. Thibaut Construction Co., Inc., 463 So.2d 1264, 1266 (La.1985).
Although we find that the trial court committed legal error, we note that "[a]bsent a prejudicial error of law, this Court is not required to review the appellate record de novo." Brumfield v. Guilmino, 93-0366, p. 12 (La.App. 1st Cir.3/11/94), 633 So.2d 903, 911, writ denied, 94-0806 (La.5/6/94), 637 So.2d 1056; See Rosell v. ESCO, 549 So.2d 840, 844 n. 2 (La.1989). Moreover, the party alleging error has the burden of showing the error was prejudicial to its case. This requires proof that the error, when compared to the record in its totality, has a substantial effect on the outcome of the case. Wallace v. Upjohn Company, 535 So.2d 1110, 1118 (La.App. 1st Cir.1988), writ denied, 539 So.2d 630 (La.1989). For the following reasons, we do not find that the error committed by the trial court was prejudicial.
*1235 There is no set term for performance stated in the subcontract, therefore, in accordance with La. C.C. art. 1778,[2] we must determine what would be considered a reasonable time for performance. Since the bid submitted by Ram Industrial is the only evidence found in the record to indicate what would be a reasonable time for completion and there is no evidence to contradict the time period stated therein, we find that the 180 days proposed by Ram Industrial in its bid is reasonable. In so finding, we likewise determine that Ram Coating breached the subcontract by delaying its performance beyond that reasonable time. Therefore, the finding by the trial court that Ram Coating breached the subcontract by not completing its performance within a 180-day time period was not prejudicial under the circumstances.

Damages
The party bringing suit has the burden of proving any damage suffered by it as a result of a breach of contract. AAA Brick Company, Inc. v. City of Carencro, 93-797, p. 6 (La.App. 3rd Cir.5/4/94), 640 So.2d 483, 485, writ denied, 94-1448 (La.9/30/94), 642 So.2d 870. In cases where a party is required to obtain the services of another to complete the contractual obligations of the breaching party, damages are assessed based on the loss sustained and the profit of which the non-breaching party is deprived. La. C.C. art. 1995; See also La. C.C. art. 2769. If there has not been substantial performance, the owner is entitled to recover the costs incurred for the completion of the work which exceeds the original contract price. Perrodin v. Southern Siding Company, Inc., 524 So.2d 885, 890 (La.App. 3rd Cir.1988).
In this case, the trial judge calculated the damages to be awarded by subtracting the original contract amount from the replacement contract amount. Waste and Transamerica contend that the trial court erred in calculating the damages on this basis because the work items comprising the replacement subcontract awarded to Global were more extensive than what was required under the original subcontract between L & A and Ram Industrial. However, neither Waste nor Transamerica presented any evidence as to value of these additional work items listed under the replacement subcontract between L & A and Global.
In Davidge v. H & H Construction Company, 432 So.2d 393, 395 (La.App. 1st Cir.1983), this court reduced the amount of damages awarded by the trial court upon finding that the evidence proved that the replacement work utilized better quality materials than what was originally used in the construction. The defendant also proved the value of the better quality materials and as such, the breaching party was not held liable for those additional costs. In the case before us, Waste and Transamerica pointed out that the work required under the replacement subcontract was more extensive than what was required under the original contract. However, they failed to prove the value of the additional work mandated under the replacement contract.
When damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages. La. C.C. art. 1999; Hollenbach v. Holden, 98-970, p. 7 (La.App. 3rd Cir.2/3/99), 728 So.2d 544, 549. So, absent an abuse of discretion, an appellate court will not disturb a trial court's assessment of damages. Mayerhofer v. Three R's Inc., 597 So.2d 151, 155 (La.App. 3rd Cir.), writ denied, 600 So.2d 680 (La.1992). Considering that *1236 neither Waste nor Transamerica presented evidence as to the value of the difference in the two subcontracts, we cannot say that the trial court abused its discretion in awarding damages based on the information before it. Mayerhofer, 597 So.2d at 155; Cf. Simon v. Fasig-Tipton Company, 92-173, pp. 21-25 (La.App. 3rd Cir.3/22/95), 652 So.2d 1351, 1366-1369, writs denied, 95-1010, 95-1013 (La.6/2/95), 654 So.2d 1111.

Award of Attorney's Fees
In their third assignment of error, Waste and Transamerica complain that the trial court erred in awarding attorney's fees under the subcontract and against the surety. It is well settled in our jurisprudence that attorney's fees are not due and owing a successful litigant unless specifically provided for by contract or by statute. Moreover, attorney's fee statutes are construed strictly because an award of attorney's fees is exceptional and penal in nature. Lain v. Credit Bureau of Baton Rouge, Inc., 93-1166, p. 10 (La.App. 1st Cir.4/8/94), 637 So.2d 1080, 1086, writ denied, 94-2010 (La.11/4/94), 644 So.2d 1049; Frank L. Beier Radio, Inc. v. Black Gold Marine, Inc., 449 So.2d 1014, 1015-1016 (La.1984). However, for the following reasons, we find that this assignment of error lacks merit.
Foremost, the subcontract not only allows for the recovery of attorney's fees in any action prosecuted to maintain or enforce the agreement, reference to the collection of such fees is made several times throughout the body of the agreement in several different contexts.
The recovery of attorney's fees is mentioned in the subcontract in sections three, four, six and ten. More importantly, the assessment of attorney's fees under sections six and ten are found to apply under the given facts of this case. Section six allows for the imposition of attorney's fees when the contractor takes over the subcontract because of the subcontractor's failure to take corrective action of any complaint for a need for an increase in job progress and/or failure of the subcontractor to pay and discharge all claims for payment of supplies, materials or equipment. Since we have previously determined that the trial court correctly held Ram Coating to be in violation of these two requirements of this section, the imposition of attorney's fees as it relates to the completion of the subcontract assignment by the contractor is clearly warranted. Under section ten, Ram Industrial agreed to "pay all of the expense and cost and attorney's fees that may be incurred in the enforcement of the conditions and obligations of this subcontract and of any bond furnished in connection herewith[.]" In that same section, attorney's fees are allowed based on the subcontractor agreeing "to indemnify and save contractor harmless from all claims, demands, costs, expenses, and attorney's fees whatsoever arising out of or pertaining to the subcontract and the performance or failure to perform the same." Therefore, without question, the assessment of attorney's fees by the trial court in its damage award was warranted under the subcontract.
In regards to the assessment of attorney's fees against Transamerica, we look to the provisions of the surety contract. Contractors' surety bonds are of two types, sometimes combined in a single bond: performance bonds, which guarantee the contractor will perform the contract; and labor and material payments bonds, which guarantee that all bills for labor and materials contracted for and used by the contractor will be paid by the surety if the contractor defaults. Bossier Medical Properties v. Abbott and Williams Construction Company of Louisiana, Inc., 557 So.2d 1131, 1133 (La.App. 2nd Cir.1990). In this case, Transamerica issued both payment and performance bonds to Ram Industrial in relation to the Miller's Bluff Bridge project. The language of the contract for the performance bond provides that if the subcontractor shall fail to "perform all the undertakings, *1237 covenants, terms, conditions, and agreements of any and all duly authorized modifications" of the subcontract, the surety agrees to indemnify and hold harmless the contractor from "any and all loss, damage, and expense, including costs and attorney's fees." Moreover, the surety contract also referred to and incorporated by reference the subcontract between Ram Industrial and L & A, which as was previously explained, provided for the assessment of attorney's fees.
Generally, a suretyship contract is an accessory promise by which the surety binds himself to fulfill the obligations of the principal, should the principal fail to perform. LSA-C.C. art. 3035. A suretyship contract binds the surety to satisfy the principal's entire obligation, unless the contract is limited. Bossier Medical Properties v. Abbott and Williams Construction Company of Louisiana, Inc., 557 So.2d 1131, 1133 (La.App. 2d Cir.1990).... While a public works bond is subject to all statutory requirements, a private works bond is purely a conventional obligation, which must be interpreted by the terms of the contract itself. Jimco, Inc. v. Gentilly Terrace Apartments, Inc., 230 So.2d 281, 283-84 (La.App. 4th Cir.1970). Moreover, a suretyship contract must be strictly construed in favor of protecting the obligee. Id.

Nicholson & Loup, Inc. v. Carl E. Woodward, Inc., 596 So.2d 374, 390 (La.App. 4th Cir.), writs denied, 605 So.2d 1098 (La. 1992).
In spite of the provisions of the contracts at issue (the subcontract and the performance bond) and the law, Waste and Transamerica contend that the assessment of attorney's fees against Transamerica was error based on La. R.S. 9:3902. La. R.S. 9:3902 authorizes a creditor who recovers the full amount claimed in the demand to recover attorney's fees. Bossier Medical Properties, 557 So.2d at 1135. We initially note that L & A did not request attorney's fees based on La. R.S. 9:3902, but in accordance with contractual provisions, therefore, it should not be bound by the terms of the statute on that basis. Furthermore, in reading the statute, we find no legislative expression restricting the parties from contractually providing for the recovery of attorney's fees. Considering the parties' freedom to contract for any purpose that is not in violation of public policy or statute, we reject this assignment of error. See La. C.C. art. 1971; Barrera v. Ciolino, 92-2844, p. 10 (La.5/5/94), 636 So.2d 218, 223.

Excessive Attorney's Fee
In the fourth assignment of error raised by Waste and Transamerica in this appeal, they contend that the trial court erred in awarding excessive attorney's fees. In reviewing this assignment of error, we consider the following principles discussed by the third circuit in Ardoin v. State, Department of Transportation & Development, 96-63 (La.App. 3rd Cir.8/14/96), 679 So.2d 928, writ denied, 96-2280 (La.11/15/96), 682 So.2d 775:
Before an appellate court will disturb an award of attorney's fees by the trial court, the record must clearly reveal that the trial court abused its much discretion in making the award. Buteau v. Leleux, 591 So.2d 1261 (La.App. 3 Cir. 1991). Factors which are to be taken into consideration in determining the reasonableness of attorney's fees include: (1) the ultimate result obtained; (2) the extent and character of work performed; (3) the responsibility incurred; (4) the number of court appearances made; (5) intricacies of the facts involved; (6) the importance of the litigation; (7) legal knowledge and skill of attorneys; and (8) diligence and skill of the attorneys. See State, DOTD v. Williamson, 597 So.2d 439 (La.1992).
Ardoin, 96-63 at. 22, 679 So.2d at 941.
In reviewing the trial court's reasons for judgment, it is clear that it considered all of the above-listed factors in calculating the amount of attorney's fees to award L & A, including the fact counsel for L & A *1238 documented over 600 billable hours for this matter. Therefore, we cannot say that the trial court abused its discretion in the amount of attorney's fees awarded. Cf. State, Department of Transportation and Development v. Williamson, 597 So.2d 439, 442-443 (La.1992).

Award in Excess of Bond
In their last assignment of error, Waste and Transamerica allege that it was error for the trial court to award damages in excess of the bond amount. We find this argument has no basis in law and that it lacks merit. Jurisprudence has held that a surety that obligates itself to fulfill all the obligations of its principal is thereby bound to pay all sums adjudged, even if they are found to be in excess of the actual bond amount. Hershell Corporation v. Fireman's Fund Insurance Company, 98-1352, pp. 14-15 (La.App. 3rd Cir.6/2/99), 743 So.2d 698, 705-706. In this case, Transamerica obligated itself to pay for any loss, damage and expense, including costs and attorney's fees. Therefore, Transamerica can and should be held liable for those costs in excess of the penal amount of the surety bond. We reject this assignment of error.

Additional Damages Claimed by L & A
In its answer to this appeal, L & A requests that we amend the judgment of the trial court to add the following items of damages: $92,238.35 for home office overhead; $80,685.34 for direct job site extended costs for 151 days; $32,503.42 for the cost of materials purchased and utilized by the replacement subcontractor, Global. Although these sums were requested in the court below, the trial court refused to grant the additional relief requested.
In its reasons for judgment, the trial judge stated that he was "not convinced by the evidence presented that all of the costs claimed were actually incurred." Looking at the evidence presented at trial, we cannot say that the trial court erred in its conclusion.
The delay damages sought by L & A were based on expenses incurred by L & A to maintain personnel on-site to supervise the work in progress. However, there is evidence in the record that during the time that Global was completing subcontract work, L & A still had other operations ongoing, and the same supervisory personnel were responsible for overseeing that work as well. Furthermore, there was no evidence presented to prove that Ram Coating's actions hindered L & A from completing its work within the extended time period granted by DOTD, nor was L & A charged any liquidated damages for failure to timely complete the project. Therefore, the trial court did not abuse its discretion in not awarding delay damages.
Furthermore, we see no reason to reverse the trial court's ruling denying L & A an award of $32,503.42 as reimbursement for the money advanced to Ram Coating to purchase paint supplies from Sigma Coating. The trial court found that the paint supplies were left at the jobsite for use by Global. We further note that Global's initial bid on the replacement contract was for $569,383.00, but the executed subcontract between L & A and Global was only for $536,880.00. The difference in these two prices equals $32,503.00. Hence, the record supports the conclusion that Global gave L & A a credit for the paint left at the jobsite by Ram Coating and therefore, L & A was reimbursed the cost of those paint supplies.
Finally, in its answer, L & A requests that the calculation of interest on the judgment awarded be amended to reflect accrual from the date of breach rather than the date of judicial demand. For the following reasons, we agree with L & A's request.
Prejudgment interest, which stems from the damages suffered by the victorious party, is meant to fully compensate the injured party for the use of funds to which he is entitled but does not enjoy because the defendant has maintained *1239 control over the funds during the pendency of the action. In contrast, post-judgment interest is a prospective award whose purpose is to encourage prompt payment of amounts awarded in the judgment, and to compensate the victorious party for the other party's use of funds to which the victor was entitled under the judgment.
Sharbono v. Steve Lang & Son Loggers, 97-0110, p. 6 (La.7/1/97), 696 So.2d 1382, 1386 (citations omitted). Interest on awards for active breaches of contract began to run "from the moment" of an active violation of a contract under La. C.C. art. 1989. As previously discussed, we find that Ram Industrial/Ram Coating breached the subcontract in three respects, the earliest of which took place on April 2, 1991 with the unauthorized assignment of the subcontract by Ram Industrial. Therefore, we amend the judgment of the trial court to reflect the accrual of interest running from the date of breach rather than the date of judicial demand.
However, we note that this amendment does not apply to the award of attorney's fees. Because attorney's fees are not ascertainable until awarded by the court, interest thereon runs only from the date awarded. Sharbono, 97-0110 at 8, 696 So.2d at 1387-1388.

CONCLUSION
After considering the evidence and arguments presented, we affirm the portion of the judgment of the trial court finding that the subcontract was breached by Ram Industrial and the court's assessment of damages. We amend the judgment to reflect the accrual of interest on the damages awarded as commencing on April 2, 1991. In all other respects, the judgment of the trial court is affirmed. Costs of this appeal are assessed against Waste Technology Corporation, Inc. and Transamerica.
AMENDED, IN PART, AND AS AMENDED, AFFIRMED.
NOTES
[1] L & A sought a waiver, from DOTD, of the weather restriction requirement mandated under section 811.05 of the "gold book" so that Ram Coating could remobilize to the jobsite. The requested waiver was denied.
[2] La. C.C. art. 1778 provides: "A term for the performance of an obligation is a period of time either certain or uncertain. It is certain when it is fixed. It is uncertain when it is not fixed but is determinable either by the intent of the parties or by the occurrence of a future and certain event. It is also uncertain when it is not determinable, in which case the obligation must be performed within a reasonable time."