951 So.2d 208 (2006)
CAJUN CONSTRUCTORS, INC.
v.
FLEMING CONSTRUCTION CO., INC. and Travelers Casualty & Surety Company of America.
No. 2005 CA 2003.
Court of Appeal of Louisiana, First Circuit.
November 15, 2006.
Rehearing Denied January 31, 2007.
*210 R. Gray Sexton, Michael D. Dupree, Tracy Meyer Walker, Baton Rouge, Counsel for Plaintiff/Appellee Cajun Constructors, Inc.
H. Bruce Shreves, James A. Burton, Herman C. Hoffmann, Jr., Denise C. Puente, New Orleans, Counsel for Defendant/Appellant Travelers Casualty & Surety Company of America.
David C. Voss, Matthew G. Tessier, Baton Rouge, Counsel for Defendant/Appellant Fleming Construction Co., Inc.
Before: PARRO, GUIDRY, and McCLENDON, JJ.
McCLENDON, J.
The defendants, Fleming Construction Co., Inc. (Fleming) and Travelers Casualty & Surety Company of America (Travelers), appeal the trial court judgment in favor of the plaintiff, Cajun Constructors, Inc. (Cajun), granting Cajun's motions for partial summary judgment against Fleming and Travelers, and awarding Cajun penalties, attorney fees and costs. For the reasons that follow, we affirm in part and reverse in part.

*211 FACTS AND PROCEDURAL HISTORY
On June 12, 2000, the United States Army Corps of Engineers (Corps), as owner, entered into a construction contract with Fleming, as general contractor, for construction of a project entitled the "Southeast Louisiana Flood Control Project, Pipeline Canal Improvements and Hurricane Protection, Westwego to Harvey Canal, Estelle Pumping Station Floodwall, Jefferson Parish, Louisiana" (the Project). As required by the contract, Fleming entered into a payment bond surety agreement with Travelers, pursuant to 40 U.S.C. § 3131(b) (the Miller Act).[1]
The Project consisted of work on the pipeline canal portion of the Project and work near the Estelle Pumping Station.[2] It is the pumping station portion of the Project that gave rise to the dispute resulting in this lawsuit. As part of the pumping station portion of the Project, Fleming was instructed to construct a large concrete wall in the shape of an inverted "T" on either side of the pumping station for flood protection. According to the plans and specifications of the contract, this T-Wall was to be constructed in an area that was thoroughly drained, so that the concrete could be poured and allowed to set in dry conditions. The task of creating this dry area was Item 0041, entitled "Drainage Control Dikes," of the fifty-four line items in the contract between the Corps and Fleming. The specifications did not describe how Fleming was to keep the area dry, other than to state that Fleming could use either "earthen dikes and or sheeting."[3]
In May of 2000, Fleming had requested Cajun to submit a bid for pile and sheet driving services on the Project. On May 17, 2000, Cajun submitted a written proposal to Fleming to perform nine items, for a total lump sum price of $773,392.50. One item was "0041 Temp. Dikes" to "Install & Remove 200 Wall Feet of PZ-27 × 40' including Bracing" (Item 0041), for the price of $200,520.00. The purpose of the wall of sheet piling was to enable Fleming to "dewater" the area on the unprotected side of the Estelle Pump Station Floodwall, so that Fleming could place required rip-rap (chunks of concrete) in the dewatered area.
Following receipt of Cajun's proposal, Fleming revised its bid on Item 0041 with the Corps to $225,000.00, and on June 12, 2000, entered into the contract with the Corps for the total contract amount of $3,342,411.00. Thereafter, on June 19, 2000, Fleming entered into the subcontract agreement with Cajun, which incorporated *212 Cajun's proposal and called for payments by Fleming to Cajun for the total lump sum price of $773,392.50.
Sometime thereafter, a meeting occurred between representatives of the Corps and representatives of both Fleming and Cajun. During the meeting, the Corps was advised of Fleming's intent to have Cajun install the 200-foot wall as a temporary dam. That plan, however, was vetoed by the Corps, as Fleming was informed by the Corps that it would not require Fleming to completely dewater the area on the unprotected side of the flood-wall to apply the rip-rap. Instead, and as a result of the meeting, Fleming constructed earthen dikes adjacent to and along the two T-wall areas to allow those areas to drain as required by the specifications with the Corps. Fleming verbally contracted with Cajun to drive sheet pilings to shore up the ends of the earthen dikes, but this work was paid on a time and material basis. No written change order was made to the contract between Fleming and Cajun to delete the construction and removal of the wall of sheet piling as set forth in Item 0041.
The Project was successfully completed by Fleming in the fall of 2001, and Fleming was paid all amounts due by the Corps. Fleming deducted $200,520.00 from the total subcontract amount with Cajun and paid Cajun the difference.[4]
On December 23, 2002, Cajun filed a Petition for Breach of Contract against Fleming and Travelers in the Nineteenth Judicial District Court, seeking the remaining contract balance amount of $200,520.00, penalties and attorney fees.[5]
In response to the lawsuit, Fleming and Travelers filed an Exception of Res Judicata, No Right of Action and Lack of Subject Matter Jurisdiction, which were denied by the trial court. Fleming and Travelers then filed their answer and asserted a reconventional demand against Cajun for certain costs relating to sheet pile bracing, sheet rental, and overtime work. Thereafter, on June 28, 2004, the parties filed cross-motions for partial summary judgment. Cajun's motion for partial summary judgment sought dismissal of Fleming's and Traveler's reconventional demand and also sought judgment against Fleming and Travelers for the remaining subcontract balance. Fleming and Travelers sought dismissal of Cajun's claim for the subcontract balance. On December 13, 2004, the trial court denied the cross motions for summary judgment on the main demand, and granted Cajun's motion for summary judgment dismissing Fleming's reconventional demand as to Cajun.[6]
On January 27, 2005, Cajun filed another Motion for Partial Summary Judgment against Fleming only, for the remaining contract balance. Following a hearing on February 14, 2005, the trial court granted the motion and awarded Cajun $200,520.00, reserving the right of Cajun to file a rule to recover penalties, attorney *213 fees and costs. Judgment to this effect was signed on March 16, 2005.
On March 15, 2005, Cajun filed a Rule to Show Cause against Fleming and Travelers to set and assess costs, penalties, and attorney fees. Following a hearing, the trial court rendered judgment in favor of Cajun and against Fleming only. On June 3, 2005, judgment was signed awarding Cajun penalties in the amount of $30,078.00, attorney fees in the amount of $79,402.78, expert costs in the amount of $5,693.47, and deposition costs in the amount of $5,290.36.[7]
On March 15, 2005, Cajun also filed a Motion for Partial Summary Judgment against Travelers on the bond Travelers had posted on behalf of Fleming. Following a hearing on the matter, the trial court rendered judgment in favor of Cajun and against Travelers for the remaining contract amount of $200,520.00. Judgment was signed on June 3, 2005.
Fleming and Travelers then filed this suspensive appeal alleging several assignments of error. Fleming asserts the following:
1. The trial court erred by not finding the contract, as amended, authorized deletion of the work not performed by Cajun without payment or compensation for work not performed by Cajun.
2. The trial court erred by not applying Louisiana Civil Code Article 2765 to the deletion of the scope of work at issue.
3. The trial court erred by applying LSA-R.S. 9:2784, which is penal in nature, to award penalties and attorney fees when Cajun did not do the work for which it seeks compensation.
4. The trial court erred by awarding attorney fees which are not reasonable.
5. The trial court erred by exercising subject matter jurisdiction over the claims by Cajun against the payment bond supplied by Fleming pursuant to 40 U.S.C. § 3131, et seq.
Travelers assigns as error:
1. The trial court erred in exercising subject matter jurisdiction over any claims against Travelers, a Miller Act surety subject to exclusive federal court jurisdiction.
2. The trial court erred in finding that the requirement that Cajun construct the 200-foot wall remained a part of the subcontract, and that Cajun retained the right to be paid for that item even though it had been deleted and was never built.
3. Alternatively, the trial court erred in awarding Cajun the full principal amount of the line item for the 200-foot wall which was never built ($200,520.00), instead of only its anticipated profits for that item ($32,113.00).
Cajun answered the appeal, seeking damages and attorney fees for a frivolous appeal.

SUMMARY JUDGMENT
Appellate courts review summary judgments de novo using the same criteria that govern the trial court's consideration of whether a summary judgment is appropriate. Guillory v. Interstate Gas Station, 94-1767, p. 5 (La.3/30/95), 653 So.2d 1152, 1155. The summary judgment procedure is favored and shall be construed to accomplish the just, speedy, and inexpensive determination of actions. LSA-C.C.P. art. *214 966(A)(2). A motion for summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966(B). Because the applicable substantive law determines the materiality of facts in a summary judgment setting, a discussion of the applicable law is appropriate. Muse v. Lane Memorial Hosp. Foundation, 04-0694, p. 5 (La.App. 1 Cir. 5/13/05), 916 So.2d 231, 234.

DISCUSSION

The Contract
Contracts have the effect of law for the parties. LSA-C.C. art.1983. Courts are obligated to give legal effect to contracts according to the common intent of the parties. LSA-C.C. art.2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. LSA-C.C. art. 2046. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. LSA-C.C. art.2050; Jackson v. Capitol City Family Health Center, 04-2671, p. 4 (La.App. 1 Cir. 12/22/05), 928 So.2d 129, 131.
Thus, when the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. This established rule of strict construction does not allow the parties to create an ambiguity where none exists and does not authorize courts to create new contractual obligations where the language of the written document clearly expresses the intent of the parties. Chailland Business Consultants v. Duplantis, 03-2508, p. 7 (La.App. 1 Cir. 10/29/04), 897 So.2d 117, 123-24, writ denied, 04-2922 (La.2/4/05), 893 So.2d 878.
However, a contract may be modified by mutual consent. While modification can be presumed by silence, inaction, or implication, one person may not change the terms unilaterally. L & A Contracting Co., Inc. v. Ram Indus. Coatings, Inc., 99-0354, p. 15 (La.App. 1 Cir. 6/23/00), 762 So.2d 1223, 1232, writ denied, 00-2232 (La.11/13/00), 775 So.2d 438. In Pelican Electrical Contractors v. Neumeyer, 419 So.2d 1, 5 (La.App. 4 Cir.), writ denied, 423 So.2d 1150 (La.1982), the fourth circuit stated:
[W]ritten contracts for construction may be modified by oral contracts and by the conduct of the parties, and this is true even when the written contract contains the provision that an owner is liable only if the change orders are in writing. It is a question of fact, therefore, as to whether there were oral agreements that modified the written contract. (Citations omitted).
Pelican, 419 So.2d at 5. Further, the party asserting modification of an obligation must prove by a preponderance of the evidence facts or acts giving rise to the modification. LSA-C.C. art. 1831; L & A Contracting Co., Inc., 99-0354 at p. 16, 762 So.2d at 1233; Big "D" Dirt Services, Inc. v. Westwood, Inc., 94-1234, p. 8 (La. App. 3 Cir. 3/1/95), 653 So.2d 604, 608; Wisinger v. Casten, 550 So.2d 685, 687 (La.App. 2 Cir.1989).
In this matter, Cajun asserts that it is entitled to judgment as a matter of law because there was no written or verbal modification to its contract with Fleming *215 to delete the $200,520.00 amount.[8] In support of its motion for summary judgment, Cajun introduced into evidence a copy of the affidavit of Tom Howard, the project manager for Cajun on the Project, together with certain deposition testimony and portions of the Corps' specifications on the Project. Attached to Mr. Howard's affidavit was a copy of Cajun's proposal to Fleming, a copy of the subcontract between Fleming and Cajun, and copies of certain invoices and correspondence. Article 8 of the subcontract provided, in pertinent part:
Article 8. Changes in Work. The Contractor and Subcontractor agree that the Contractor may add to or deduct from the amount of Work covered by this Subcontract, and any changes so made in the amount of Work involved, or any other parts of this Subcontract, shall be by a written amendment hereto setting forth in detail the changes involved, the value thereof and the time increase or decrease due to such change which shall be mutually agreed upon between the Contractor and Subcontractor. . . . Should Subcontractor and Contractor fail to agree on the value of the changed work, then the value of the changed work shall be determined in accordance with the Contract Documents. . . .
Also made part of the subcontract were the Pile Driving Terms and Conditions. The section entitled Extra Work or Reduction of Work provided, in pertinent part:
Credit will be given for omission or deletion of work and/or materials in the full amount of their value, only when due written notice of such changes or deletions is given such that adequate time is provided to cancel materials with its suppliers and to stop any affected operations which may cause expense in this connection.
It is undisputed that no written change order as required by the contract was ever executed regarding Item 0041. Nevertheless, Fleming and Travelers contend that the contract was amended to delete the obligation to build the 200-foot wall which, therefore, deleted the obligation to pay the amount due under the contract for this item. Fleming and Travelers contend that although the subcontract required a written change order, such provisions have been universally disregarded by the courts, allowing additions to the scope of work without a written change order. Fleming and Travelers acknowledge that the cases they cite refer to additions to the scope of work, but they contend the same reasoning would apply to deletion of work without objection or by necessity. Fleming and Travelers assert that the subcontract was modified by oral agreement and conduct of the parties, since all the parties knew that the wall was not to be constructed following the meeting with representatives from the Corps. Fleming further argues that the contract was amended by implication due to the actions and directives of the Corps, and by the silence and inaction of Cajun after those directives. Thus, according to Fleming and Travelers, there was no need for a written change order.
Fleming and Travelers offered certain deposition testimony, as well as the affidavit of Joe Malley, a general superintendent for Fleming, to show that the contract was amended. Tom Howard, Cajun's project manager, recognized that the work was not performed. He testified:

*216 Q. As I understand your testimony, under the payment item for drainage control dikes, Cajun didn't perform any work?
A. Not to my knowledge.
Carlton Ware, a project manager for Fleming, also testified:
Q. Tell me what you know about that.
A. What I know about it up to the time I left is that Tom knew we weren't going to sheet that back canal.
Q. Tom knew
A. So therefore Item 0041 had been deleted from this contract by the simple fact that we weren't going to do it. It was a lump sum item, and he was not going to perform any of the work to collect that item.
Mr. Malley also testified:
Q. Nevertheless, it's your testimony that it was appropriate under the circumstances to amend this particular contract verbally and to delete the scope of work verbally based on this conversation that you have alluded to?
A. Yes, sir.
Cajun concedes that an oral agreement and associated conduct can, under certain circumstances, prove the occurrence of a modification of a contract. Cajun, however, disagrees that there was ever an oral agreement in this matter to amend the contract to change the terms of payment, or that the contract was amended by implication, based on its actions. Cajun asserts that its conduct, wherein Cajun continued to request payment for the remaining amount due under the subcontract, clearly did not reflect any agreement by Cajun to delete the $200,520.00 amount from its lump sum contract.
In support of its position, Cajun also submitted into evidence the deposition testimony of Mr. Malley and Mr. Ware. Mr. Malley testified:
Q. Do you recall if there was indeed a written amendment that deducted the $200,000 pay item from Cajun's scope?
A. I don't think there was.
Q. Why?
A. Because we assume[d] Tom was at the same meeting we were and that he was not going to do the work.
Q. But you assumed Fleming was going to get paid by the corps for not doing the work, correct?
A. That's correct.
Q. But you thought that Tom would exactly assume the opposite; is that your testimony?
A. Yes.
* * *
Q. Exactly. Why, then, did you not issue the written amendment that's required by Article 8?
A. We should have, but we do things verbally all the time, I mean. We do things on a handshake.
Q. Okay. Was there ever a verbal handshake with Tom in which you showed him that you were deleting from his payment $200,520?
A. Not in those specific words, no.
Q. The only words that you ever had with Tom on that issue concern the conversation to which Jackie Fleming was subsequently a party and in which you told Tom that at the end of the job, you would settle up with him after you reviewed your costs reports; fair statement?
A. That's a short version of it, yes.
Q. Is it an accurate version?
A. Other than me telling him that we wasn't giving him 20, 30, or $40,000. You know, there was never no mention *217 that we were going to discuss the $200,000.
Q. $200,000 was never discussed?
A. No.
Also, Mr. Ware testified during his deposition:
Q. Do you recall if you told Tom Howard that Fleming was not going to pay Tom for the 041 portion of its subcontract?
A. I don't know of that, no.
Q. Would it be fair to say that you certainly didn't tell Tom that he wasn't going to get paid his subcontract amount? Correct?
A. I didn't think I had to.
Q. Would it be fair to say that, to your knowledge, no one else with Fleming ever told Tom that Cajun was not going to get paid the subcontract amount?
A. I don't know if it's fair to say or not. I just know, when we left that meeting, we knew we were not going to do Tom's portion of the work, and I think TomI'm almost certain Tom knew he wasn't going to do that portion of the work, either, and I think that was the end of the discussion.
Q. So it would be correct to say that you did not tell Tom that Cajun was not going to get paid 200
A. I didn't discuss anything about payment with Tom at all.
Q. And you weren't aware of any other employees of Fleming that might have discussed payment with Tom?
A. Not that I'm aware of.
The trial court, in oral reasons at the February 14, 2005 hearing, determined that the subcontract was a lump sum contract, that under Article 8 of the contract, a written change order was required, that no written change order was ever executed by the parties, and that no verbal agreement was ever entered into and agreed to by Fleming and Cajun. The trial court further determined that Cajun was never officially told to delete Item 0041 from its bid price, although it was clear, after the meeting with the Corps that the wall was not going to be built. We agree with the trial court.
Following a thorough review of the record, we find that Fleming and Travelers submitted insufficient evidence to establish a genuine issue of material fact regarding modification of the contract to delete the $200,520.00 amount. The evidence offered by Fleming and Travelers failed to show that the contract was amended orally or by implication.
Fleming makes the additional argument that LSA-C.C. art. 2765 applies in this case and permits it, as a matter of right, to delete Item 0041 from the contract between Fleming and Cajun. Fleming asserts that the most it should pay to Cajun is the contract price less the costs Cajun would have incurred to have completed the item deleted by the decision of the Corps. In other words, under LSA-C.C. art. 2765, Fleming contends that it need only pay Cajun for its lost profits.
Louisiana Civil Code article 2765 provides:
The proprietor has a right to cancel at pleasure the bargain he has made, even in case the work has already been commenced, by paying the undertaker for the expense and labor already incurred, and such damages as the nature of the case may require.
Article 2765 is inapplicable. Fleming did not cancel its contract with Cajun. See Bramlette v. Hebert, 210 So.2d 361, 363 (La.App. 3 Cir.), writ refused, 252 La. 835, 214 So.2d 161 (1968) ("[Article 2765] is concerned with a situation where the proprietor *218 desires to cancel a construction contract before the work is substantially completed.").
Accordingly, summary judgment in favor of Cajun and against Fleming in the amount of $200,520.00, for the remaining balance due under the contract, was proper.

Penalties and Attorney Fees
The trial court also awarded Cajun penalties in the amount of $30,078.00, representing fifteen per cent of the remaining contract balance, and attorney fees in the amount of $79,402.78 against Fleming, pursuant to LSA-R.S. 9:2784.[9]
Louisiana Revised Statute 9:2784 provides, in pertinent part:
A. When a contractor receives any payment from the owner for improvements to an immovable after the issuance of a certificate of payment by the architect or engineer, or when a contractor receives any payment from the owner for improvements to an immovable when no architect or engineer is on the job, the contractor shall promptly pay such monies received to each subcontractor and supplier in proportion to the percentage of work completed prior to the issuance of the certificate of payment by such subcontractor and supplier, or by the owner if no architect or engineer is on the job. Further, whenever a subcontractor receives payment from the contractor, the subcontractor shall promptly pay such monies received to each sub-subcontractor and supplier in proportion to the work completed.
* * *
C. If the contractor or subcontractor without reasonable cause fails to make any payment to his subcontractors and suppliers within fourteen consecutive days of the receipt of payment from the owner for improvements to an immovable, the contractor or subcontractor shall pay to the subcontractors and suppliers, in addition to the payment, a penalty in the amount of one-half of one percent of the amount due, per day, from the expiration of the period allowed herein for payment after the receipt of payment from the owner. The total penalty shall not exceed fifteen percent of the outstanding balance due. In addition, the contractor or subcontractor shall be liable for reasonable attorney fees for the collection of the payments due the subcontractors and suppliers. However, any claim which the court finds to be without merit shall subject the claimant to all reasonable costs and attorney fees for the defense against such claim.
Fleming argues that Cajun can only be awarded penalties and attorney fees for work actually performed and that because it did not construct the sheet-piling wall, the trial court erred in making such awards. We agree that the statute provides that the contractor shall promptly pay each subcontractor "in proportion to the percentage of work completed . . . by such subcontractor." However, having found that this was a lump sum contract and that the work required of Cajun was completed, we reject this argument.
Fleming further asserts it had reasonable cause to withhold payment to Cajun. The trial court found otherwise. In its oral reasons for judgment, the trial court stated:

*219 Fleming, throughout the history of this litigation, has taken the position that they had a lump-sum contract with the Corps of Engineers, and that by virtue of that lump-sum contract, they would be paid in full, even if work that was contained within the bid was not done, was altered or was done for less. Regardless of what was done, they fully expected to be paid in full by the Corps. Likewise, Fleming knew that Cajun had a lump-sum contract with Fleming. The same logic applies. A lump-sum contract, you're going to be paid in full based on the lump sum bid.
* * *
Fleming has taken the position, and it was argued again here today, that Cajun knew they were not going to be paid and they knew that all along. And again, my review of this record, both in connection with today's hearing and in connection with the prior motion for summary judgment, it is void of any evidence or testimony. And I'm not looking for a letter that Fleming says, Cajun, you're not going to be paid for pay item 41. Even a deposition transcript where they were orally told that you're not going to be paid, that doesn't exist. As I appreciate the record, at all times Cajun was led to believe and continued to submit request for payment that included pay item 41.
* * *
It's a lump-sum contract. Looking at the actions of Fleming in connection with its subsequent dealings with Cajun after the meeting with the Corps, as well as its actions with the Corps, I don't find that the position taken by Fleming to withhold payment to Cajun was with reasonable cause.
After a thorough review of the record, we find no error in the trial court's determination that Fleming did not have reasonable cause to withhold payment from Cajun. Fleming's representative, Jack Fleming, admitted in his deposition that the contract at issue was for a "lump sum amount." Mr. Ware testified that he thought that Fleming would simply pocket the $200,520.00. Additionally, Fleming incorrectly certified to the Corps that it had paid all invoices and that it had notified Cajun "to pull Item 0041 from their price." Accordingly, we find that the trial court did not err in awarding Cajun penalties, in the amount of $30,078.00, and attorney fees, in the amount of $79, 402.78, as permitted by LSA-R.S. 9:2784.

Subject Matter Jurisdiction as to Travelers
The payment bond issued by Travelers provided a surety obligation if Fleming failed to promptly make payment to all persons having a direct relationship with Fleming "for furnishing labor, material or both in the prosecution of the work provided for in the contract." Travelers asserts that the trial court erred in failing to dismiss Cajun's claim against Travelers for lack of subject matter jurisdiction. Travelers also alleges that Cajun does not have a claim against Travelers under the Miller Act, because Cajun did not provide labor or materials relative to construction of the 200-foot wall.
It is well settled jurisprudentially that the rights created by the Miller Act are federal in nature and scope. Federal district courts have exclusive jurisdiction over suits against sureties on payment bonds under the Miller Act. Bernard Lumber Co., Inc. v. Lanier-Gervais Corp., 560 So.2d 465, 466 (La.App. 1 Cir.1990). While the Miller Act is not the exclusive remedy available to suppliers in some cases, it is the exclusive remedy available to a supplier *220 against a surety on a Miller Act payment bond. Bernard Lumber Co., Inc., 560 So.2d at 467.
In this matter, Cajun is seeking recovery against Travelers under the payment bond. Although Cajun did not request relief against Travelers in this action under the Miller Act, the only basis for assertion of a claim against Travelers is the payment bond obtained under the Miller Act in favor of the United States. The Miller Act is the exclusive remedy available to Cajun against Travelers, and we reverse that portion of the judgment against Travelers in the amount of $200,520.00.

Frivolous Appeal
Cajun has answered the appeal seeking damages from Fleming and Travelers for a frivolous appeal. The imposition of damages for a frivolous appeal is regulated by LSA-C.C.P. art. 2164.[10] Courts have been very reluctant to grant damages under this article, as it is penal in nature and must be strictly construed. Even when an appeal lacks serious legal merit, damages for a frivolous appeal will not be awarded unless it is clear that the appeal was taken solely for the purpose of delay or that appellant is not serious in the position he advocates. Dukes v. Sherwood Acres Apartments, 04-0405, pp. 3-4 (La. App. 1 Cir. 12/30/04), 898 So.2d 416, 418.
Based on our review of the record, we are convinced that Fleming was serious in the position it advocated.[11] Therefore, we decline to assess further penalties in the form of damages for frivolous appeal.

CONCLUSION
Based on the above and foregoing, we affirm the trial court's judgments of March 16, 2005, and June 3, 2005, against Fleming, awarding Cajun the amounts of $200,520.00, representing the remaining balance due under the contract, $79,402.78 in attorney fees, $30,078.00 in penalties, and expert and deposition costs. The trial court's judgment against Travelers in the amount of $200,520.00 is hereby reversed. Costs of this appeal shall be assessed against Fleming.
AFFIRMED IN PART, REVERSED IN PART.
NOTES
[1] A payment bond is required under the provisions of the Miller Act "for the protection of all persons supplying labor and material in carrying out the work" provided for in contracts in excess of $100,000.00 "for the construction, alteration or repair of any public building or public work of the Federal Government." 40 U.S.C. § 3131(b).
[2] The work was combined so that excavated material from the pipeline portion of the Project could be used as fill on the pumping station portion of the Project.
[3] Subsection "1.3.5 Drainage Control Dikes" of Section 02320 of the specifications provided:

No measurement will be made for drainage control dikes as specified herein. Payment for the construction of earthen dikes and or sheeting as specified herein will be made at the contract lump sum price for "Drainage Control Dikes". Price and payment will constitute full compensation for furnishing all plant, labor, equipment and material, except earthen materials, submitting a dewatering plan, for performing all operations necessary to keep the area receiving semicompacted fill and T-wall concrete placement operations dry as specified herein.
[4] Other change orders were issued and approved by Fleming in the amount of $61,435.88. The revised total subcontract amount was $834,828.38. Fleming made payment to Cajun totaling $634,308.38, leaving the remaining contract balance of $200,520.00
[5] Cajun had previously filed suit, on January 14, 2002, in the United States District Court for the Eastern District of Louisiana against Fleming and Travelers for the contract balance, but that action was dismissed on September 29, 2003, without prejudice, for lack of subject matter jurisdiction.
[6] The minute entry of December 13, 2004, reflects the trial court's judgment, although there is no written judgment in the record. This judgment was not appealed.
[7] Penalties were awarded pursuant to LSA-R.S. 9:2784(C), which provides for a penalty in the amount of one-half of one percent of the amount due, per day, not to exceed fifteen percent of the outstanding balance due, which in this matter was equal to the $30,078.00 amount.
[8] Although Cajun has argued that the March 16, 2005 judgment, granting Cajun summary judgment against Fleming, was not properly appealed, a prior panel of this Court, on January 9, 2006, maintained the appeal of the March 16, 2005 judgment by Fleming and Travelers.
[9] The parties stipulated that Cajun incurred legal fees in the amount of $79,402.78 in connection with the state court action and that that amount was paid by Cajun to counsel for Cajun.
[10] Article 2164 provides:

The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal. The court may award damages for frivolous appeal; and may tax the costs of the lower or appellate court, or any part thereof, against any party to the suit, as in its judgment may be considered equitable.
[11] It is self-evident that Travelers' appeal, having merit, was not frivolous.