MARION F. EDWARDS, Judge.
 

 |2Both plaintiff/appellant, Wilbur J. Ba-bin Jr., as trustee of LanTech Construction Company, LLC (“LanTech”), and defendant/cross-appellant, David Speed d/b/a Driftwood Spur (“Speed”), appeal from a judgment of the district court granting Speed liquidated damages in the amount of $31,400 and the cost of concrete repairs in the amount of $112,212.50.
 

 In January 2000, Speed entered into a contract with LanTech for the renovation/conversion of a Texaco station in Ken-ner. The initial price of the project was $203,507. In its Petition for Breach of Contract and Damages, LanTech averred that change orders increased the price to $217,874 of which $45,598 remained unpaid. Ultimately, Speed filed a Reconven-tional Demand for sums expended to complete and/or repair the project, including the cost of removal and replacement of concrete. Speed also asked for liquidated damages for failure of LanTech to timely complete the project.
 

 | :iTrial commenced on December 13, 2004, at which time only Speed’s testimony was taken. After more delays, the parties agreed in 2008 to submit depositions as trial testimony. On May 22, 2008, the trial court rendered its judgment, finding:
 

 1. That the parties entered into “very sloppy business practices,” and that LanTech failed to show evidence that Speed signed any change orders as mandated by the contract.
 

 2. That Speed benefited by the work done and that LanTech was entitled to the cost of the change orders, subject to setoff for damages due to Speed.
 

 3. That the concrete work in the project was defective because of the poor workmanship of LanTech, and Speed was entitled to $112,212.50 for the cost of repairs.
 

 4. That Speed was entitled to liquidated damages in the amount of $31,400 as per the contract for failure to timely complete the project.
 

 
 *291
 
 On appeal, LanTech urges that the trial court erred in failing to enforce the express provisions of the contract; that the trial court’s ruling was inherently inconsistent in awarding the cost for the change orders but not the time to perform them; and that Speed’s testimony was contradictory and unreliable and should have been disregarded
 
 in toto.
 
 On cross-appeal, Speed counters that the court erred- in permitting any recovery by LanTech pursuant to change orders improperly executed and that there was no evidence that the cost of the change orders was approved, or that it was reasonable and justified. Speed also argues that the trial court erred in failing to grant his Motion for Involuntary Dismissal. However, the record was designated by both Lantech and Speed and contains no motion for involuntary dismissal. Therefore, we decline to consider that assignment of error.
 

 In trial testimony, Speed testified that the architect, Charles Ward of Rozas-Ward Architects (“Ward”), designed a renovation of the premises in question. He stated that he did not “think” he had signed a contract with LanTech. Ward orally informed Speed that he knew someone (LanTech) who could handle the Lrenovations. LanTech and Speed orally agreed on a contract price of “around $200,000.” Kevin Marino (“Marino”) was the contractor who worked on the premises. Since Marino left, the roof has been repaired and some of the pipes had recently cracked in the slab. However, Speed stated that recent photographs shown to him at trial depict the premises as they looked when the job was completed, and the station has continued to be in use since August of 2000.
 

 Speed complained to Ward about the renovations several times because of mistakes that were being made. Marino did not come every day. The concrete laid by LanTech is chipping, cracking, and dissolving. The City of Kenner told Speed he needed a “grease trap” behind the building, as well as a dike with a drain. Speed agreed that these items were required. The city also required extra pilings. In addition, Speed told Marino to fence in the property around the dumpster, which had to be moved from one side of the building to the other. Speed also wanted fencing around the air conditioning compressors. The air conditioning units had to be changed because the wrong ones were installed. There was an increase of $5000 in cost regarding the air conditioners, but Speed agreed with Marino to “leave it alone” because he didn’t want to pull the units out. Some changes had to be made because of drainage and lighting problems. The neighbors did not want the big lights that had been installed, and Speed asked Marino to change them. Speed requested an upgrade change in ceiling tiles, which resulted in a delay.
 

 Speed testified that he would pay Mari-no when he was given a bill and when Marino had completed a certain amount of work. He had heard that LanTech was going to go bankrupt and held back on paying Marino because of the problems he saw with the concrete. According to Speed, LanTech did not finish everything when it left the job. When Speed got the final bill, he did not pay it nor did he contact Ward to complain about what had not been completed.
 

 | r,Speed’s deposition, which continued his trial testimony, was taken in 2007. In contrast to that testimony, Speed denied having approved any extensions of time or changes in price. The delays occurred because no one was on the job.
 

 Copies of the Change Orders submitted separately as exhibits by the plaintiff/appellant and the defendant/appellee have significant discrepancies in both the signa
 
 *292
 
 tures and dates on which they were signed. They can be summed up as follows:
 

 Change Order # 1 — revision of gas company footings — add five days.
 

 Change Order
 
 #2
 
 — remove storefront, add seven days; block work in storefront, add seven days; addition of a grease trap, add five days; additional fencing at the rear, add three days; upgrade of air conditioner, add five days. Change Order # 3 — change of ceiling tiles — add fifty-five days. LanTech’s exhibit shows 400 days, clearly an error according to Architect Charles Ward. Date of substantial completion changed to June 2.
 

 Change Order # 4 — additional concrete footage, add ten days. Speed’s exhibit shows addition of forty days, with a substantial completion date of July 12. Change Order # 5 — canopy drainage, add forty days. The completion date is July 27.
 

 Change Order # 6 — adding gate, enclosure around air compressor, fir down between cigarette rack and ceiling, add ten days. Date of substantial completion is August 10. Speed was given credit for overage on contract time, thirty days at $200 per day or $6000.
 

 Ward testified by deposition that Speed was concerned about the delays in the work. Speed received a credit of $6000 on Change Order # 6 for the number of days that the contractor was late. The change order work was discussed primarily between Speed and Marino. The Application Certification for Payment stated that the work was completed by August 10, 2000, but, due to issues with Speed about the delay of the job and the quality of the concrete finish, the document was not signed until March 21, 2001. Ward, who had authority to reject work that did not conform to the contract, felt that the concrete was within the industry standard. | sWarcl did not receive notice of any deficiencies within the one-year period established by the contract. The contract calls for a starting date of January 5, 2000, with a completion date of March 10. According to the contract, the owner or contractor who desired a change order typically contacted the architect, who would figure out the details of the proposed change, have everyone agree on the price and delays, and then get a formal change order. The architect and the owner have to approve any change that would become a formal change order, which had to be submitted by the contractor to the architect and owner. Change orders are typically prepared and signed before the change is made, unless a construction change directive was issued, which was not the case here. In this case, Ward’s actual involvement with the contract was administrative and very limited, and he was not usually involved with the change orders. Change Order # 3, dated July 5 was signed by him August 2, 2000 and by Marino on July 19. Ward believed that the delay in time for his signature was a result of discussing and negotiating the changes with Speed, and, once he felt Speed agreed, Ward signed the order. Order # s 4 and 5 were dated and signed by Ward and Marino on the same day. As before, Ward testified that the dates probably coincided with his visit to the job and a meeting to discuss change orders, signed at the owner’s request after several meetings. The only way he would have signed is if he felt Speed had agreed to the changes.
 

 In his deposition, Marino testified the original contract between Speed and Lan-Tech called for ninety days completion at a price of $238,440 and was for a Texaco station. When the job was changed from a Texaco to a Spur station, the time went down to sixty days and the price to
 
 *293
 
 $203,500. According to Marino, Change Order # 1 involved a change of canopy footings and came from Speed’s canopy company’s engineer. Five days were added to the project, and Speed |7agreed to the changes. Change Order # 2 involving concrete block work was done at Speed’s request and added seven days. The Board of Health required a grease trap resulting in Change Order # 3. Change Order # 4 involved additional fencing requested by Speed. Change Order # 5 involved a change in the number and tonnage of AC units. These changes resulted in an additional $9694 added to the contract price and twenty-seven days to the completion deadline. Speed wanted the ceiling tiles upgraded, and he agreed to the increased cost of $593. Twenty-one days were added for the change and nineteen for delayed payments. Additional paving to the parking lot was requested by Speed for $3584 and forty days were added. This change order was signed by Ward as well as by Marino. Installing additional canopy drain lines was requested by Speed adding $518 and forty days because they had to wait for the canopy company to install all the columns. Change Order # 6 reflects a change in the lighting, a gate added by Speed, as well as an enclosure around the air compressors. The certificate of substantial completion was August 10, 2000.
 

 According to Marino, he, Speed, and LaPlace Concrete met and the concrete was tested in the spots about which Speed was concerned.; The tests showed the concreted was well over the p.s.i. required.
 

 Sometimes no one showed up because Speed had not paid sums due on invoices. Speed refused to sign the change orders after the fact. Marino agreed that the change orders were prepared and signed after the work was completed.
 

 The essential issue on appeal is whether the change orders were valid.
 

 The contract in question clearly requires written requests for modification. Nevertheless, the contract does not expressly prohibit oral modification. A written contract is the law between the parties, and the parties will be held to full ^performance of the obligations flowing from their contract.
 
 [1]
 
 However, the law is clear that written contracts may be modified by oral contracts and the conduct of the parties, even when the written contract contains a provision that change orders must be in writing.
 
 [2]
 
 Modification of a written agreement can be presumed by silence, inaction, or implication.
 
 [3]
 
 The party who asserts that an obligation has been modified must prove by a preponderance of the evidence facts or acts giving rise to the modification.
 
 [4]
 
 It is a question of fact, therefore, as to whether there were oral agreements that modified the written contract.
 
 [5]
 
 Oral modifications alleged to be in excess of $500 must be proved by at least one “credible witness” and “other corroborating circumstances.” Only general corroboration is required.
 
 [6]
 
 Parol evidence is
 
 *294
 
 admissible for this purpose.
 
 [7]
 

 The trial court recognized these principles in its determination that Speed benefited from the work done and allowing the costs of the change orders. On review of the record, we find no manifest error in this regard. Here, Speed testified that he agreed to the changes required by the City of Kenner, including extra pilings (reflected in Change Order # 1) as well as the addition of the grease trap (reflected in Change Order # 2). Speed requested fencing in the property around the dumpster and air conditioning compressor (as per Change Order # s 2 and 5, in part). The lighting changes were also requested by Speed (Change Order # 6, in part) as well as the changes in ceiling tiles (Change Order # 3). Although his credibility was called into question by his deposition testimony, Speed’s statements |sagainst his own interest provide the necessary general corroboration to prove oral modifications of the written contract.
 

 In the present case, the oral modifications must necessarily have provided consent to the extensions allowed in the change orders. Further, the testimony of Ward indicates that the changes were consented to by Speed. The final change order showed August 10 as the date of substantial completion, and the Certificate of Substantial Completion was issued on that date, although not signed by the architect until March 21, 2001. Ward did not recall the reason for the delay in his signature. The record supports a finding that August 10 is the applicable date of completion. Therefore, because the project was substantially completed by that date, Speed was not entitled to liquidated damages.
 

 Speed’s complaint and request regarding replacement of the concrete was supported by the testimony of Roy Carub-ba (“Carubba”). Carubba, accepted as an expert in civil engineering, testified that he inspected the property and determined that the majority of the paving had exposed aggregate, which normally means there was an excessive amount of water that prevented the cement from adhering properly to the aggregate. There were stains indicative of ponding due to improper sloping, and some areas were cracked between the control joints. The concrete could have been placed improperly or it could have been exposed to excessive heat. Carubba agreed that the finish on recently poured concrete could also have been affected by use of a high-pressure hose. In his opinion, the mix design was probably improper at the time of placement. He estimated it would cost $112,212.50 to remove and replace the concrete. Therefore, the trial court correctly awarded this amount to Speed.
 

 For the foregoing reasons, the judgment is affirmed in part, reversed in part, and amended. That portion of the judgment awarding liquidated damages is 1 ^reversed. We affirm the award of $112,212.50 to Speed for the replacement of concrete. The judgment is amended to reflect that LanTech is awarded the amount of $45,598. Each party is assessed its own cost of appeal.
 

 AFFIRMED IN PART; REVERSED IN PART; AMENDED AND RENDERED.
 

 WICKER, J., Concurs.
 

 [1]
 

 . LSA-C.C. arl. 1983;
 
 Aqua Pool Renovations, Inc. v. Paradise Manor Community Club, Inc.,
 
 04-119 (La.App. 5 Cir. 7/27/04), 880 So.2d 875.
 

 [2]
 

 .
 
 Id.; Rhodes Steel Buildings, Inc. v. Walker Const. Co.,
 
 35,917 (La.App. 2 Cir. 4/3/02), 813 So.2d 1171, 1177.
 

 [3]
 

 .
 
 Aqua Pool Renovations, supra; Cajun Constructors, Inc. v. Fleming Const. Co., Inc.,
 
 05-2003 (La.App. 1 Cir. 11/15/06), 951 So.2d 208,
 
 writ denied,
 
 07-0420 (La.4/5/07), 954 So.2d 146.
 

 [4]
 

 . LSA-C.C. art. 1831;
 
 Aqua Pool Renovations, supra.
 

 [5]
 

 .
 
 Cajun Constructors, supra.
 

 [6]
 

 . Peter Vicari Gen. Contractor, Inc. v. St. Pierre,
 
 02-250 (La.App. 5 Cir.10/16/02), 831 So.2d 296.
 

 [7]
 

 .
 
 Id.