GRAVOIS, J. |,Plaintiffs/appellants, Larry and Lynda Vinet, appeal a trial court judgment that was rendered against them and in favor of defendant, D & M Renovation, L.L.C. (“D & M”), which awarded $9,547.51 to D & M on its reconventional demand against plaintiffs, the sum D & M claimed it was owed from plaintiffs as an extra amount on the home renovation contract the parties had entered into. The trial court also dismissed plaintiffs’ principal demand for damages against D & M and its principal, Donald C. Ray, Sr., for alleged defective construction work under the contract. After thorough review of the record, evidence, and applicable law, we find no manifest error in the trial court’s factual findings, or legal error in the trial court’s conclusions of law. Accordingly, we affirm the judgment -in favor of D & M on its reconvention demand and the dismissal of plaintiffs’ principal demand.- FACTS AND PROCEDURAL HISTORY Plaintiffs’ home in LaPlace, Louisiana, sustained flood damages from Hurricane Isaac in 2012. Plaintiffs contracted with D & M to perform the renovations required to remedy the flood damages to their home. Plaintiffs became familiar with D & M after observing at least three flood renovation projects that D & M had performed in their neighborhood. Plaintiffs’ home required remediation for up to four feet above floor level, the approximate level of the flooding. The home had already been completely gutted prior'to D <⅞ M’s beginning the job. This “gutting” included the removal of cabinets and removal of sheetrock up to four feet above the floors, except in the living room, where wall, paneling had been removed from the floor to the ceiling.[1] , . The parties’ negotiations led to several successive written contracts that described the scope of the work and the. contract price. The first contract had a 12total price of $36,000.00 for the project, but due to Mr. Vinet’s concerns, about keeping to a budget, some items, and materials were changed and the contract was reworked to a total price of $30,000.00.[2] However, plaintiffs later added a Jacuzzi tub to the requested work, which resulted in a written contract with a total final price of $32,500.00, which contract was signed by the parties on November 8, 2012 (the “final contract”). The mortgagee, Wells Fargo, held the insurance proceeds and controlled disbursement of the contract proceeds to D & M upon verification through home inspections that the claimed work had been performed. Work began on the project on or about December 1, 2012 and the project was substantially completed on December 24, 2012. Throughout the renovation process, Mr. Vinet continued to live in the- home. Mrs. Vinet and other family members stayed elsewhere during the construction. Mr. Ray testified that he is a “fast track” contractor who works onsite on his jobs rather than in the office (which was in Gretna, Louisiana). Accordingly, he was present at the Vinet jobsite during most days while the work was going on. He testified that Mr. and Mrs. Vinet made numerous changes and additions to the contract after the work began on December 1, 2012, including: • adding a second Jacuzzi tub; • changing the floors from laminate tile throughout the house to more expensive ceramic tile in certain spaces of the house; • applying and reapplying interior paint in rooms and to several ceilings that already had been painted; • installing bi-fold doors in the kitchen, hall closet, and living room instead of standard doors; • patching holes in the drywall and ceilings of several rooms; • performing temporary skim coat repair of a crack in the garage ceiling; • installing a clothing dryer vent set and a hall furnace vent set; Is* sound-proofing the master bedroom’s interior walls to mute noise caused by the Vinets’ grandchildren; and • installing window casings. Mr. Ray testified that as per .the fingí contract, he was not responsible for anything over four feet high in the house, except for the kitchen cabinets ⅛ and the walls in the living room where the paneling had to be replaced with sheetrock. He testified that Mr. Vinet asked him to perform certain repairs or jobs that were not included in the original contract because they were higher than four feet. Mr. Vinet agreed at trial that he did in fact request the additional work and upgrades; he testified, however, that 'Mr. Ray told him that he (Mr. Ray) would “add” these items to the original contract, which Mr. Vinet thought meant that the upgrades and additions would be included in the final contract without any additional charges) At trial, Mr.r Ray testified to the contrary, however, stating that he told Mr. Vinet several times that additional'charges would be incurred for the additional work and for making repairs above the four-foot mark. The testimony presented at trial confirms that Mr. Vinet made the requests for changes and additions verbally, with Mr. Ray agreeing verbally that he would add the items to the contract.[3] Both parties testified that the additional work and changed materials that plaintiffs requested were in' fact done, though Mr. Vinet claimed in his suit that the workmanship was defective in many respects. , Mr. Ray testified that because Mr, Vinet made so many requests for additions and changes as the work progressed, it would have been too time consuming for him to go back to his office in Gretna to write each one up as a change order every time Mr. Vinet made a change request. Rather, he compiled all of the extra work into documentation that he presented .to Mr. Vinet for signature Rafter the job was complete, in order for D & M to get payment from Wells Fargo. Mr. Ray testified that he prepared and presented two documents to Mr. Vinet for signature. Both documents were entitled “Extra Work Order.” The first Extra Work Order, which was personally presented to Mr. Vinet at his home on January 8, 2013, totaled $5,941.89, and according to Mr. Ray, represented only a “rough estimate” of the changes and additions to the final contract.[4] The second Extra Work Order (hereinafter, the “final Extra Work Order”), which was mailed to Mr. Vinet on February 4, 2013, totaled $9,547.51, and represented the final total cost of all of the extra work done on the Vinet job. Mr. Vinet, however, refused to sign either Extra Work Order, claiming that Mr. Ray had agreed to “include” the extra work in the final contract, and accordingly, D & M was owed nothing more. Mr. Vinet responded to the final Extra Work Order by reporting D & M to numerous consumer groups, including the Better Business Bureau and the Louisiana Attorney General’s Office, alleging that D & M had performed substandard work and had defrauded the Vinets. D & M responded by placing a lien against the Vinets’ home for the amount claimed in the final Extra Work Order. According to testimony, Wells Fargo declined to pay plaintiffs the balance of the insurance proceeds until their dispute with D & M was resolved. The Vinets then filed suit against E & M and Mr. Ray individually, alleging that were performing substandard work under the contract, and for wrongfully placing the lien against them property.[5] D & M reconvened for the extra amount it claimed was due from plaintiffs for work performed and materials used on the project, as set forth ⅛ the final Extra Work Order, as well as for damages for defamation. After a trial on the merits, the court rendered | - judgment with written reasons in favor of d & M in the amount of $9,547.51, the amount D & M claimed was due for the additions to the contract. No damages were awarded to D & M for defamation. The judgment denied plaintiffs’ claims for damages for defective workmanship and filing of the lien. Plaintiffs’ appeal followed.[6] On appeal, plaintiffs assign the following errors: 1. The trial court erred by ignoring testimony and evidence clearly demonstrating that D & M did not adhere to the contract in that it allowed plaintiff to make verbal change orders; 2. The trial court erred by ignoring testimony and evidence clearly establishing a breach of contract (ie., the performance of extra work pursuant to verbal, not written, change orders); 3. The trial court incorrectly ignored the uncontradicted expert testimony of Keith Morvant, inspector, South Central Planning and Development Commission; 4. The trial court ignored trial testimony and evidence clearly demonstrating damages due to defective workmanship; and 5. In rendering final judgment, the trial court erred in awarding D & M $9,547.51, plus legal interest thereon, and court costs. STANDARD OF REVIEW It is well settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error”- or unless it is “clearly wrong,” and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). I «ASSIGNMENTS OF ERROR NUMBERS ONE AND TWO Contract requirements and breach of contract In them first two assignments of error, plaintiffs argue that the trial court erred in not enforcing the provision in the final contract that required that change orders be written prior to execution of the work contained therein. Plaintiffs, argue that D & M, therefore, breached the final contract by executing the additional work and changes verbally requested by the Vinets, without first executing a written change order. Plaintiffs do not appear to claim, however, that the extra work and upgrades they requested verbally were not, in fact, completed by D & M. In Lantech Constr. Co., L.L.C. v. Speed, 08-811 (La. App. 5 Cir. 5/26/09), 15 So.3d 289, 293-94 (internal citations omitted), this Court provided the following concerning oral modification of written contracts, to-wit: A written contract is the law between the parties, and the parties will be held to full performance of' the obligations flowing from their contract. However, the law is clear that written contracts may be modified by oral contracts and the conduct of the parties, even when the written contract contains a provision that change orders must be in writing. Modification of a written agreement can be presumed by silence, inaction, or implication. The party who asserts that an obligation has been modified must prove by a preponderance of the evidence facts or acts giving rise to the modification. It is a question of fact, therefore, as to whether there were oral agreements that modified the written contract. Oral modifications alleged to be in excess of $500 must be proved by at least one ‘credible witness’ and ‘other corroborating circumstances.’ Only general corroboration is required. Parol evidence is admissible for this purpose. In the present case, the provision in the final contract- that purports to require written change orders reads as follows, to-wit: Any alterations or deviation from the above specifications involving extra cost of material or labor will be executed upon written order for same, and will become an extra charge over the sum mentioned in this contract. All agreements must be made in writing. Upon review, we find that it is not necessary to determine whether the final Extra Work Order complied with this provision, as it is clear by the parties’ conduct, as revealed by trial 'testimony, that the written contract was modified to allow the 17additional work' and changes requested by plaintiffs to be executed upon plaintiffs’ ■ verbal requests to Mr. Ray. Both parties testified that plaintiffs did in fact request the additional work and changes listed in the final Extra Work Order. Mr. Vinet lived at the home during the renovation, and therefore was present at the jobsite much of the time, by his own testimony, including those times when the extra work and changes requested were being performed. The record fails to show that at any time did Mr. Vinet ever protest that the extra work and upgraded materials he requested should not be executed because a written work order had not been presented to him first by Mr. Ray. Defendants showed, therefore, by the testimony of credible witnesses and corroborating circumstances (the parties’ conduct) that the parties 'modified the construction contract to allow verbal change orders. The above-quoted contract provision also states that the alterations or deviations involving extra cost of material or labor “will become an extra charge over the sum mentioned in this contract,” yet plaintiffs claimed that Mr.'Ray either never said that extra money would be owed or that they somehow thought that their supplemental requests would be done at no additional charge or change to the $32,500.00 total in the final contract. Mr. Ray’s testimony claimed otherwise, however, his version being that plaintiffs knew they were incurring extra costs by their additional requests for material and labor that were not specifically itemized in the final contract, because he told them so, and because the contract provision quoted above so stated. The trial court’s factual findings and credibility determinations are entitled to great.weight and will not be disturbed on appeal absent manifest error. When findings, of fact are based on determinations regarding the credibility of witnesses, the manifest error-dearly wrong standard demands great deference to the trier of fact’s findings. Rosell v. ESCO, supra; Stead v. Swanner, 12-727 (La. App. 5 Cir. 5/16/13), 119 So.3d 110, 117. The trial court, faced with the. contradictory |8testimony of Mr, Vinet and Mr. Ray, as well as the entirety of the evidence, clearly believed Mr, Ray’s testimony over Mr. Vinet’s, that plaintiffs knew that the additions to the contract also came with additions to the price. Upon review, we find that there is no manifest error in the trial 'court’s conclusions that D & M did not breach the construction- contract by performing the additional ■ work ■ upon plaintiffs’ verbal requests without a con-, temporaneous written change order. These assignments of error are without merit.. ASSIGNMENT OF ERROR NUMBER THREE Failed inspection In their next assignment of error, plaintiffs argue that the trial court .was manifestly erroneous in failing to find that D & M performed shoddy and substandard work. First, plaintiffs argue that the trial court incorrectly ignored the uncontradict-ed expert testimony of Keith Morvant, an inspector with South Central Planning and Development Commission, who inspected plaintiffs’ home in July of 2013 and concluded that some of the home’s electrical components failed inspection. Mr. Morvant performed two inspections of plaintiffs’ home. Both inspections, he testified, concerned only electrical components. The first inspection occurred in October of 2012, prior to D & M’s engagement. The scope of that inspection determined that the electrical components that had gotten wet in the flood had been replaced. Mr. Morvant’s second inspection of plaintiffs’ home took place on July 1, 2013, more than six months after D & M completed the job. Mr. Ray testified that neither he nor his crew set foot in the house after the end of December of 2012. Plaintiffs occupied the home during that time period. The inspection report, entered into evidence, reveals that the only items that caused the inspection to fail were electrical issues. The report stated that: “Receptacles need to be secured where they do not move when in use. Cover plates are needed on all [flreceptacles and switches. Lights need to be fastened to celling. Receptacles for tubs need to be mounted on walls, not laying face up on the floor. Owner present for Inspection.”[7] Mr. Morvant, who testified at trial, did not have an independent recollection of this particular inspection. He guessed that a “bunch” of electrical cover plates must have been missing, and further guessed that light fixtures must have been hanging from the ceiling. He testified that the tub receptacles were mounted on the floor, which was not allowed. There is no evidence, however, that the electrical items were deficient at the time D & M completed the project. The video made by Mr, Ray upon the job’s substantial completion, entered into evidence, notes three uncovered outlets, but Mr. Ray testified that these were completed after the video was made and prior to Mr. Mor-vant’s inspection. Also, an inspection was performed at the behest of Wells Fargo in December of 2012, in order to certify that the contract work was complete. This inspection was required before Wells Fargo would release the remainder of the $32,500.00 contract price to D & M, which it did following the inspection. Furthermore, the evidence reflects that, as noted earlier, the electrical work was done by a “Mr. Martinez,” whom D & M had hired as an electrical subcontractor for this job because of Mr. Martinez’s prior work at plaintiffs’ house,[8] There was no evidence presented that D ■& M was responsible for the electrical deficiencies noted in the second inspection or, if even D & M was responsible for the location of the tub receptacles; that it was ever given ah opportunity to remedy the deficiency,[9] Accordingly, while Mr. Morvant’s | intestimony was uncontradicted, there is no evidence that the trial court ignored his testimony. This assignment of error is without merit; ¡ ASSIGNMENT OF ERROR NUMBER FOUR Evidence of defective workmanship Next, plaintiffs argue that the trial court erred in ignoring trial testimony and evidence clearly demonstrating damages due to defective workmanship. Specifically, they argue that they presented evidence in the form of Mr Vinet’s testimony, Mr. Morvant’s testimony, pictures of the house depicting the defective workmanship, and two estimates from other construction companies of the purported costs to renovate their home: Defendants countered with the videos of the progress of the work made by Mr. Ray during the course of the project, including on December 24, 2012 near the end of the project, Mr. Ray’s testimony, and the testimony of his son, Darryl Ray, Jr. If an undertaker fails to do the work he has, contracted to do, or if he does not execute it in the manner and at the time he has agreed .to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract. La. C.C. art. 2769.- To establish the contractor’s liability for damages due to defective workmanship, the owner must prove the following: (1) the existence and nature of the defects; (2) that the defects are due to faulty materials or workmanship; and (3) the cost of repairing the defects. Melancon v. Tri-Dyne Tele-Pier, LLC, 11-1055 (La. App. 5 Cir. 5/31/12), 95 So.3d 576, 581. In its reasons for judgment, the trial court provided: The plaintiffs presented no expert testimony to prove that D & M’s performance was below industry standards nor was there testimony by an expert regarding the cost to remedy such alleged defects. Instead, the plaintiffs provided quotes from two construction companies. The first quote was handwritten and illegible from what appeared to be excessive photocopying, and it was only recently prepared in 2015, three years after D & M completed the work on the Vinet home. The other quote was from a Mississippi based company that is no longer licensed to do business in either Mississippi or InLouisiana. The plaintiffs also presented several undated and unclear photographs of alleged defects, several'of which depicted work that was not covered in the contract between the parties, such as work done above the four-foot mark as stipulated in the parties’ contract. Mr. Vinet had a daily opportunity to complain about the alleged poor workmanship of D & M, or alternatively telLD & M to cease the work on his property. However, the evidence reveals that Mr. Vinet did not do so. Considering all of the evidence, and circumstances, including the fact that Wells Fargo completed its final- inspection and released $32,500 based on the house passing inspection, the Court finds that plaintiffs’ claims are unsupported and that D & M completed the work on plaintiffs’ home in a substantial and workmanlike manner. Our review of the evidence shows no manifest error in the trial court’s factual findings and conclusion that plaintiffs failed to establish the existence of defective workmanship. This Court has reviewed all of the photographs submitted by plaintiffs, as well as three videos of the Vinet house made by Mr. Ray during the construction progress.[10] The final video fails to corroborate the photographs of “defective work” submitted by plaintiffs. Many of photographs themselves are unclear or cannot be clearly identified as depicting the Vinets’ house after the work was completed. While Mr. Vinet testified that the photographs depicted his home after D & M had finished the work, Mr. Ray testified that a few of the photographs that he could identify appeared to show work in progress. Again, faced with a credibility determination, the trial court clearly credited Mr. Ray’s testimony and evidence over that of Mr. Vinet. The trial court’s determinations are entitled to great deference by this Court, and we find no manifest error therein. Likewise, we find no manifest error in the trial court’s assessment of the two construction estimates submitted by plaintiffs. These estimates do not establish that D & M performed defective construction work in plaintiffs’ home. Besides the issues noted by the trial court in its reasons for judgment, we note that neither estimate states that D & M performed defective construction work, and additionally, |Ti>the estimates include renovations that were not included in either the final contract or the final Extra Work Order. Finally, the trial court correctly noted that plaintiffs had numerous opportunities to complain about the quality of the work while the construction project was ongoing, especially given that Mr. Vinet continued to reside in the home during construction, and failed to do so. Even after the project was completed, Mr. Vinet admitted that he never called Mr. Ray to complain about the work or to request that he remedy any problems. Defendants submitted two letters, dated February 19, 2013 and March 1, 2013, that the Vinets sent to D & M after the project was completed, both asking if D & M had received the final check from Wells Fargo (which did not include the amount due on the final Extra Work Order). The letters asked D & M to notify the Vinets if they had not received the check so that a replacement check could be issued. These letters are otherwise identical, and fail to express any displeasure in the work D & M performed. This assignment of error is without merit. ASSIGNMENT OF ERROR NUMBER FIVE Damage award Lastly, plaintiffs argue that the trial court erred in awarding defendant $9,547.51 in damages, representing the amount D & M claimed was due for the extra work and materials as set forth in the final Extra Work Order. In brief, however, plaintiffs do not contest the calculation of this amount or the itemization of the changes and additions noted by D & M in the final Extra Work Order. Plaintiffs argue, again, that the trial court erred in not giving effect to the contract provision that required written changes orders prior to extra work, and they also point to their testimony that they believed the extra work requested on the job was included in the final contract. They argue that D & M should not be rewarded for its “arbitrary actions.” | ^Previously in this opinion, we have rejected plaintiffs’ position that the final contract’s provision regarding written change orders was hot subsequently modified by the parties’ assents and conduct. We have further rejected plaintiffs’ position that D & M breached the contract by performing the extra work plaintiffs verbally requested. We also found no merit to plaintiffs’ contention that they believed the extra work would be included in the original price of the final contract.[11] Accordingly, the arguments reiterated here, as a basis to reverse the monetary judgment in D & M’s favor, are without merit. CONCLUSION For the foregoing reasons, the trial court’s judgment under review is affirmed. AFFIRMED . Some electrical work had already been performed at the Vinet home by a "Mr. Martinez,” which included replacing wall electrical receptacles, prior to D & M's engagement. D & M later retained Mr, Martinez to elevate the receptacles once it was determined that this was required by the applicable building code. . Mr. Vinet testified' that his insurance proceeds were needed not only for the repairs to his home, but also to purchase some new furniture and other items damaged by the flood waters. . Darryl Ray, Jr., Mr. Ray’s son, who worked as a laborer on the house on a daily basis, testified that several times Mr. Vinet would request some work outside the scope'of the contract and Darryl would stop work on a contract item and begin the new job immediately to accommodate Mr. Vinet. . Mr. Ray testified that his encounter with Mr. Vinet at the Vinet home on January 8, 2013 was contentious. During this encounter, Mr. Ray described that Mr. Vinet would not let him in the house, yelled at him, “sicced” his dog on him, and even physically pushed him. . In its reasons for judgment, the trial court found that Mr. Ray could not be held personally liable for the damages claimed by plaintiffs. .Originally, D & M also appealed the trial court’s judgment. However, D & M’s appeal was dismissed as abandoned pursuant to Uniform Rules—Courts of Appeal, Rule 2-8.6. D & M did not file an appellee brief in the Vinets’ appeal. . The inspection was requested by Mr. Vinet. . Mr. Martinez was hired by plaintiffs to replace the wet electrical components prior to D & M’s engagement. D & M hired Mr. Martinez to do additional electrical work based on the fact that plaintiffs had hired him previously, . Mr. Ray testified that he did not place the tub’s electrical receptacles in the floor, . The three videos depict when the work began, midway through the work, and upon substantial completion of the job. . The trial court found in its reasons for judgment that plaintiffs had requested the additional work and upgrades, that such had been performed by D & M in a workmanlike manner, and that it would be unjust enrichment if plaintiffs were not required to pay for them.